IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.   No. 14-CR-4223 MCA

PEDRO ROMERO-VEGA,

    Defendant.

**MAGISTRATE JUDGE'S PROPOSED FINDINGS
AND RECOMMENDED DISPOSITION**

THIS MATTER is before the Court on Defendant's Motion to Suppress and Memorandum in Support Thereof, filed December 22, 2014. (Doc. 16.) By Order of Reference filed January 7, 2015 (Doc. 25), this matter was referred to the undersigned to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case. In his motion to suppress, Defendant asks the Court to suppress "all evidence, including his fingerprints and identity, obtained as a result of his illegal arrest" on October 28, 2014. (Doc. 23 at 6.) The Court, having reviewed the submissions of the parties and the relevant law, having heard the evidence and argument presented by counsel at a hearing on January 26, 2015, and being otherwise fully advised, concludes that Defendant's motion to suppress is well taken and recommends that it be GRANTED.

**I. Introduction**

On October 28, 2014, Defendant Pedro Romero-Vega was passing through Albuquerque, New Mexico on an Amtrak train from Los Angeles, California. While the train was stopped in Albuquerque, United States Drug Enforcement Administration ("DEA") Agent Jarrell Perry arrested Defendant for conspiracy to possess with intent to distribute methamphetamine,

1

although he has not been charged with this offense. After his arrest, Defendant was fingerprinted, and Agent Perry obtained evidence of his identity and of his alleged previous removal from the United States. Defendant now faces charges of illegal reentry into the United States in violation of 8 U.S.C. § 1326. In his motion to suppress, Defendant contends that Agent Perry arrested him without probable cause in violation of the Fourth Amendment to the United States Constitution, and that all evidence obtained as a result of the arrest, including evidence of his fingerprints and identity, should be suppressed.

## II. Proposed Factual Findings

The Court proposes the following findings of fact, based on the evidence presented at the January 26, 2015 hearing on this matter:

1. On or about October 28, 2014, while reviewing Amtrak passenger name records, Agent Perry became aware of two Amtrak reservations. (Hrg. Rec. at 0:23.[1]) The first was for Kevin Carrillo[2] and Stephany Torres, one-way from Fullerton, California to Orlando, Florida, reserved in person on October 21, 2014 at 3:29 p.m. for $1,988 in cash and picked up at 3:11 p.m. the following day in Los Angeles. (*Id.* at 0:24.) The second was for Miguel Rodriguez-Mesa and Taira Camacho, one-way from Fullerton to Orlando, reserved on October 21, 2014 at 3:30 p.m. and paid for in $1,988 cash at 3:11 p.m. the following day in Los Angeles. (*Id.* at 0:24-25.) The respective reservations were for two different sleeper rooms and two different train cars. (*Id.* at 0:25.) According to the records Agent Perry reviewed, both couples boarded the train in Fullerton at 7:46 p.m. on October 27, 2014. (*Id.* at 0:24, 0:26.)

---

[1] References to "Hrg. Rec." are to the Liberty System recording of the January 26, 2015 hearing on Defendant's motion to suppress, numbered ABQ-Cimarron_20150126_992342.dcr.

[2] Kevin Carrillo is the name under which Defendant Pedro Romero-Vega was traveling. (Hrg. Rec. at 0:35-37.) At the time of Defendant's arrest, Agent Perry did not know that Defendant was traveling under an assumed name. (*Id.* at 1:31.)

2.      Agent Perry claimed that, before he went to the train station on October 28, 2014, he had information that a Stephany Torres was "believed to be" transporting methamphetamine from California to Orlando. (*Id.* at 1:11.) No reasonable officer could have relied on this information. Agent Perry did not provide any information about its source or whether it was trustworthy to any degree. (*Id.* at 1:11-12.) Also, beyond noting that they had the same name, he did not take any steps to determine whether the Stephany Torres allegedly suspected of transporting methamphetamine and the Stephany Torres traveling on the train were the same person, for example by comparing dates of birth. (*Id.*) Agent Perry was apparently aware of the information's unreliability, because he did not include it in his report. (*Id.*)

3.      Agent Perry did not have any information about Defendant, Mr. Rodriguez-Mesa, or Ms. Camacho before he went to the train station on October 28, 2014, other than the information in the Amtrak passenger name records. (*Id.* at 1:10, 1:12-13.)

4.      Agent Perry has reviewed hundreds of Amtrak reservations. (*Id.* at 0:26.) He testified that it is not unusual to travel from California to Orlando; that there is an Amtrak route from Fullerton to Orlando; that in his experience, Orlando "is not a big destination" for people traveling from California on the train; and, that he recalls fewer than five such reservations but "there may have been other ones." (*Id.* at 0:26-27, 1:20.)

5.      After reviewing the reservations discussed above, Agent Perry went to the Amtrak station in Albuquerque on October 28, 2014. (*Id.* at 1:13.) Kevin Small accompanied Agent Perry to the station. (*Id.*) Mr. Small used to be a DEA agent but has retired, and now works for a DEA contractor as a financial investigator. (*Id.* at 0:10, 0:14.) He is not a law enforcement officer. (*Id.* at 0:11.) Agent Perry referred to Mr. Small as his "partner" during his encounters with Defendant, Ms. Torres, Mr. Rodriguez-Mesa, and Ms. Camacho. (*Id.* at 0:18.)

3

6.      Agent Perry sent Mr. Small to the sleeper room assigned to Defendant and Ms. Torres. (*Id.* at 0:28, 1:13.)  At the room, Mr. Small spoke to a car attendant, whose name he does not remember.  (*Id.* at 0:14, 0:18.)  She told Mr. Small that she had moved Defendant and Ms. Torres to a room next to Mr. Rodriguez-Mesa's and Ms. Camacho's room, and that the two couples were traveling together.  (*Id.* at 0:14-15.)  Mr. Small conveyed this information to Agent Perry. (*Id.* at 0:29.)

7.      Agent Perry then made contact with Mr. Rodriguez-Mesa and Ms. Camacho.  (*Id.* at 0:30.)  During the ensuing conversation, Ms. Camacho told Agent Perry that she and Mr. Rodriguez-Mesa were traveling with a male and a female, whom she did not identify by name. (*Id.* at 0:31-33.)

8.      Agent Perry obtained permission to search Ms. Camacho's and Mr. Rodriguez-Mesa's luggage.  (*Id.* at 0:31.)  While Agent Perry was conducting this search, Defendant approached the room across the hall.  (*Id.* at 0:33-34.)  Agent Perry greeted Defendant and asked him if he was "traveling with them," apparently referring to Mr. Rodriguez-Mesa and Ms. Camacho.  (*Id.* at 0:45-46.)  Defendant responded, "no, we're over here."[3]  (*Id.*)  Defendant's answer indicates that Defendant understood Agent Perry to be asking if he and Ms. Torres were traveling in the same room with Mr. Rodriguez-Mesa and Ms. Camacho.

9.      Agent Perry then asked Defendant if he spoke English, to which Defendant responded, "uh yeah?"  (*Id.* at 0:46.)  Defendant's accent and syntax throughout Agent Perry's recording of the investigation[4] make it apparent that English is not Defendant's primary language.

---

[3] Agent Perry at one point misquoted Defendant's answer to this question, testifying that Defendant said he and Ms. Torres were "by themselves."  (Hrg. Rec. at 1:29.)  However, Agent Perry's audio recording of the statement is more reliable than his memory of it; and, the recording clearly indicates that Defendant said "no, we're over here." (*Id.* at 0:45-46.)

[4] Agent Perry recorded significant portions, but not all, of his interactions with Defendant, Ms. Torres, Mr. Rodriguez-Mesa, and Ms. Camacho. (Hrg. Rec. at 0:37, 1:02-1:03.)

10.	While searching the luggage in Mr. Rodriguez-Mesa's and Ms. Camacho's room, Agent Perry found a clear plastic bundle concealed in a glued compartment of a laptop case Mr. Rodriguez-Mesa gave him.  (*Id.* at 0:31-32.)  The bundle was later determined to contain methamphetamine.  (*Id.*)  Agent Perry placed Mr. Rodriguez-Mesa and Ms. Camacho under arrest and put them in a room down the hall.  (*Id.* at 0:33.)

11.	Agent Perry then approached Defendant and Ms. Torres and asked, "I assume you're all in the same room you're traveling together?"  (*Id.* at 0:51.)  Defendant responded, "say what?" (*Id.*)  Agent Perry then asked, "you're in the same room, are y'all traveling together?"  (*Id.*)  By asking the question in this manner, Agent Perry reinforced Defendant's understanding that, when Agent Perry said "traveling together," he meant traveling together in the same room.  Defendant responded, "oh yeah we are traveling together."  (*Id.*)

12.	Agent Perry asked for, and Defendant and Ms. Torres provided, their train tickets.  (*Id.* at 0:34.)  While reviewing the tickets, Agent Perry read the name "Miguel Rodriguez" from an attached receipt, and asked Defendant if that was his name.  (*Id.* at 0:35, 0:51.)  Defendant responded, "no, that's not me," and pointed to the name under which he was traveling.  (*Id.*; *id.* at 1:09.)  Thus, Defendant knew that Agent Perry had seen his and Mr. Rodriguez-Mesa's names on the same receipt, and had no reason or ability to conceal this fact.

13.	Agent Perry asked a number of questions about Defendant's and Ms. Torres' travel plans, which Defendant and Ms. Torres answered.  (*Id.* at 0:35-0:57.)  At times, Agent Perry and Defendant had some difficulty understanding one another.  (*Id.*)  For example, Agent Perry asked where he and Ms. Torres were "traveling to today," meaning their ultimate destination, and Defendant responded "Chicago," which was where Defendant had been told they would have to wait for several hours before continuing on to Orlando.  (*Id.* at 0:50-51.)

14.     In response to Agent Perry's questions, Defendant explained that he and Ms. Torres were traveling to Orlando to pick up a car belonging to Ms. Torres, which they would then drive back to California.  (*Id.* at 0:56.)

15.     Agent Perry asked Defendant and Ms. Torres if they were traveling with anyone else, to which Defendant responded, "no, we're not."  (*Id.* at 0:35, 0:56-57.)  Later, Agent Perry stated, "you told me you guys aren't traveling with anybody else, you're by yourselves?"  (*Id.* at 1:00.)  Defendant's response to these statements, if any, is inaudible.  (*Id.*)

16.     Agent Perry conceded that he did not know what was in Defendant's mind when he responded to Agent Perry's questions regarding whether he and Ms. Torres were "traveling with" anyone else, and specifically did not know whether Defendant understood him to mean traveling in the same room with anyone else.  (*Id.* at 1:24-25, 1:29.)  Agent Perry did not ask Defendant if he knew Mr. Rodriguez-Mesa and Ms. Camacho, if they had made their reservations together, and/or if they were going to the same destination.[5]  (*Id.* at 1:24-25, 1:29.)

17.     Defendant and Ms. Torres gave Agent Perry permission to search their room and luggage.  (*Id.* at 1:26.)  Agent Perry did not locate any contraband or other suspicious items in the course of this search.  (*Id.*)

18.     After he searched their room and luggage and found nothing suspicious, Agent Perry arrested Defendant and Ms. Torres for conspiracy to possess with intent to distribute methamphetamine.  (*Id.* at 1:04-05; 1:08; 1:31.)  At Agent Perry's direction, Mr. Small handcuffed Defendant and ordered him off the train.  (*Id.* at 0:18, 1:04-05.)

---

[5] Agent Perry at one point resumed his intermittent audio recording in the middle of a conversation with Defendant, in which Defendant stated that he did not know "them." (Hrg. Rec. at 1:02-03.)  However, the recording does not include the portion of the conversation in which he or Agent Perry presumably described the persons about whom they were speaking. (*Id.*)  Further, the government has offered no argument or evidence on this critical point.  Based on the record, and particularly in light of the government's silence, the Court has no foundation on which to make any assumptions about whom Defendant said he did not know.

19.     Agent Perry identified the following circumstances as providing probable cause for him to arrest Defendant:  (a) the way Defendant, Ms. Torres, Mr. Rodriguez-Mesa, and Ms. Camacho purchased their tickets as indicated by Amtrak's passenger name records; (b) the information provided by the unidentified car attendant, that she had moved Defendant and Ms. Torres next to Mr. Rodriguez-Mesa and Ms. Camacho and that they were traveling together; (c) Defendant's statements that he and Ms. Torres were not traveling with anyone else; and, (d) Ms. Camacho's statement that she and Mr. Rodriguez-Mesa were traveling with a male and a female.  (*Id.* at 1:30.)

20.     After Defendant was arrested and "processed," Agent Perry "ran his fingerprints" and learned that his name is Pedro Romero-Vega.  (*Id.* at 1:31.)  The government does not dispute that the fingerprinting and identification led directly to the discovery of evidence regarding Defendant's alleged immigration status.  (*See* Doc. 20 at 3-4.)

### III.  Legal Standards

Under the Fourth Amendment, "[a]n arrest is characterized by highly intrusive or lengthy search or detention, and must therefore be supported by probable cause."  *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004).

> Probable cause to arrest exists when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

*Id.*  "Probable cause must be evaluated in light of [the totality of the] circumstances as they would have appeared to a prudent, cautious, trained police officer."  *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999).  "A factor does not become irrelevant simply because it is readily susceptible to an innocent explanation," and the Court must "look not only to the facts supporting probable cause, but also to those that militate against it" in assessing the totality of

7

the circumstances. *Valenzuela*, 365 F.3d at 897. Although probable cause does not require facts sufficient for a finding of guilt, it does require more than mere suspicion. *United States v. Springfield*, 196 F.3d 1180, 1183 (10th Cir. 1999), *abrogated on other grounds by Chambers v. United States*, 555 U.S. 122 (2009); *Gordon*, 173 F.3d at 767.

It is well-established that "[a] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *see Sibron v. State of New York*, 392 U.S. 61, 62 (1968) ("The inference that persons who talk to narcotics addicts are engaged in the criminal traffic of narcotics is simply not the sort of reasonable inference required to support…probable cause."); *United States v. Hansen*, 652 F.2d 1374, 1390 (10th Cir. 1981) ("[T]raveling with suspected cocaine dealers…may give rise to a suspicion that [the defendant] was also involved in the drug activity, but it does not give rise to probable cause.").

> The argument that one who accompanies a criminal to a crime rendezvous cannot be assumed to be a bystander…is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal.

*United States v. Di Re*, 332 U.S. 581, 592 (1947), *abrogated on other grounds by Elkins v. United States*, 364 U.S. 206 (1960). Rather, to establish probable cause in such cases, circumstances must show a "tie" or "connection" between the defendant and the contraband or illegal activity in question. *Springfield*, 196 F.3d at 1183.

"The ordinary remedy in a criminal case for violation of the Fourth Amendment is the suppression of any evidence obtained during the illegal police conduct." *United States v. Perez-Partida*, 773 F.Supp.2d 1054, 1059 (D.N.M. 2011). In the Tenth Circuit, evidence of identity may be suppressed as fruit of the poisonous tree, except in cases involving jurisdictional

8

challenges not at issue here. *United States v. Olivares-Rangel*, 458 F.3d 1104, 1109-12 (10th Cir. 2006). "A party seeking exclusion of evidence on Fourth Amendment grounds must demonstrate both actual police misconduct that violated the defendant's Fourth Amendment rights, and that the evidence to be excluded was in fact a product of the police misconduct." *United States v. Williams*, 356 F.3d 1268, 1272 (10th Cir. 2004). Once a defendant has made these showings, "the burden then shift[s] to the government to prove that the evidence is not 'fruit of the poisonous tree,'" *id.*,

> by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.

*United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (citations omitted).

Courts generally weigh three factors to determine whether there has been sufficient attenuation to dissipate the taint of unconstitutional police conduct: (1) temporal proximity; (2) intervening circumstances; and, (3) the purpose and flagrancy of the police misconduct. In the context of fingerprint evidence, the Tenth Circuit has applied a more specific rule:

> if an illegal arrest was purposefully exploited for the objective of obtaining fingerprints, then the fingerprint evidence must be suppressed…. Conversely, in the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine booking procedure are not fruit of a poisonous tree.

*Olivares-Rangel*, 458 F.3d at 1116.

> The proper inquiry is whether or not the Government has proven that no part of Defendant's arrest or subsequent fingerprinting involved an exploitation of his unlawful detention for the purpose of linking him to any illegal activity, including his suspected unlawful presence in the United States.

*Perez-Partida*, 773 F.Supp.2d at 1068. The Court will consider Defendant's motion to suppress in light of the foregoing standards.

## IV. Analysis

**A.     Agent Perry did not have probable cause to arrest Defendant for conspiracy to possess with intent to distribute methamphetamine.**

The Court must first consider whether Agent Perry had probable cause to arrest Defendant for conspiracy to possess with intent to distribute methamphetamine. For the reasons discussed below, the Court concludes that he did not. In arresting Defendant for this offense, Agent Perry testified that he relied on: (1) Defendant's propinquity to others independently suspected of criminal activity (Mr. Rodriguez-Mesa and Ms. Camacho); (2) the nature of Defendant's train ticket and the manner in which he purchased it (one-way purchased with cash); and, (3) Defendant's denial that he was "traveling with" anyone other than Ms. Torres. (Hrg. Rec. at 1:30.)

Each of these factors is inadequate to support a finding of probable cause. As noted above, "mere propinquity" to persons independently suspected of criminal activity has repeatedly been held not to establish probable cause. *Ybarra*, 444 U.S. at 91; *compare Maryland v. Pringle*, 540 U.S. 366, 372-73 (2003) (defendant's arrest not based on mere propinquity where contraband and large amount of cash were found within defendant's reach). Likewise, although in some cases the cash purchase of a one-way ticket has been included in probable cause analyses, standing alone it is facially insufficient to support a reasonable belief that a crime is being committed.[6] *See Gordon*, 173 F.3d at 767 (collecting cases). Finally, Defendant's denial that he was "traveling with" anyone other than Ms. Torres is inadequate to establish probable cause. Defendant's denials were accurate according to his evident and reasonable understanding that Agent Perry intended to ask if he was traveling in the same room with anybody else. In

---

[6] In its briefs, the government also argued that Defendant's route, *i.e.*, Fullerton to California, was a factor contributing to probable cause. However, the evidence adduced at the hearing on Defendant's motion to suppress did not support this argument. Agent Perry's testimony confirmed the rather obvious fact that there is nothing suspicious about traveling from the Los Angeles area to Orlando. (Hrg. Rec. at 0:26-27, 1:20.)

short, none of these factors, standing alone, constitute probable cause to believe that Defendant was connected to the drugs concealed in the laptop in Mr. Rodriguez-Mesa's and Ms. Camacho's room.

The remaining question, then, is whether these factors constitute probable cause when considered together, though they obviously do not do so alone.  Recognizing that every case is unique and must ultimately turn on its own facts, the Court nevertheless finds the *Di Re*, *Hansen*, *Gordon*, and *Springfield* cases instructive because, read together, they make two important points:  (1) that to find probable cause in "propinquity" cases, there must be a nexus not only between the defendant and a suspected criminal, but also between the defendant and the suspected criminal activity or contraband; and, (2) in considering the totality of the circumstances, the Court must consider both factors tending to support probable cause, and factors tending to negate it.  The Court will discuss each of these cases, and their relevance to this matter, in turn.

In *Di Re*, a "propinquity" case, the United States Supreme Court described circumstances tending to support an assumption that "one who accompanies a criminal to a crime rendezvous" is merely a bystander.  332 U.S. at 592.  These include "when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city," and "where the alleged substantive crime is one which does not necessarily involve any act visibly criminal." *Id.*

Agent Perry encountered Defendant in circumstances similar to those described in *Di Re*. At the time of Defendant's arrest, Agent Perry had reason to believe Defendant was accompanying Mr. Rodriguez-Mesa and Ms. Camacho to a crime rendezvous.  However, the surrounding circumstances supported the assumption that he was merely a bystander.  Defendant

and his alleged traveling companions were not in a secret or suspicious hide-out; they were on a train and at a train station, in plain sight of other passengers, Amtrak personnel, and passersby, in a relatively large city in the middle of the day. (Hrg. Rec. at 0:11 (Mr. Small met Agent Perry at the Amtrak station around noon)). Similarly, the alleged substantive crime did not necessarily involve any act visibly criminal. The methamphetamine in question was concealed in a glued compartment in a laptop case in Mr. Rodriguez-Mesa's and Ms. Camacho's room. This alleged criminal activity would not have been necessarily visible to Defendant or anyone else. The *Di Re* case thus calls attention to the innocuous nature of the circumstances surrounding Defendant's propinquity to Mr. Rodriguez-Mesa and Ms. Camacho.

The *Hansen* decision, another "propinquity" case, is illuminating because in it, the Tenth Circuit found probable cause to arrest one defendant (Means), but not another (Bryant), thus identifying with more than usual precision when circumstances crossed the line between mere suspicion and probable cause. The *Hansen* court found that officers had probable cause to arrest the defendant Means. 652 F.2d at 1388. The court summarized the basis of the officers' probable cause as follows:

> [t]hey had information from which it could be inferred that [known drug dealer] Thomas's source of cocaine was staying at the motel in the vicinity of rooms 240-244, that the source still probably had 1 ¾ pounds of cocaine with him, and that Means, Hansen [another co-defendant], and Bryant had arrived together and registered at the same time from the same home state as Thomas. They had information from the search of Hansen's room 241 indicating drug activity but the cocaine itself was not found in the room. And significantly, they knew that the key to Means's room 242 was found in Hansen's room. We conclude that this evidence was sufficient for the agents to believe that Means was involved in the drug activity and that he might indeed have the cocaine in his room.

*Id.*

However, the *Hansen* court found that the officers did *not* have probable cause to arrest the defendant Bryant. *Id.* at 1390. There were, essentially, two differences between what the

12

officers knew about Means, and what they knew about Bryant. The first difference was that the key to Means's room 242 was found in Hansen's room 241 along with other evidence of drug activity, including plastic bags of rice, a small quantity of hashish, a piece of paper with an undercover cocaine buyer's phone number on it, and tape marks on Hansen's body. *Id.* at 1378, 1389. Finding Means' room key in Hansen's room amidst evidence of drug activity connected Means not only to Hansen, but also to his drug activity and missing cocaine. In contrast, even the cocaine eventually found in Means's room "indicated merely that Means and Hansen were both involved in drug activity. However, there was still no evidence linking Bryant to such activity beyond mere association." *Id.* The second difference between Means and Bryant was that "nothing suspicious was observed in [Bryant's] room," which "tended to negate probable cause" as to him. *Id.* at 1390.

In the present matter, the Court finds that Defendant's circumstances are more like those of Bryant than those of Means. Like Bryant, Agent Perry had reason to believe Defendant was "traveling with suspected [drug] dealers," but no evidence linking Defendant to drug activity beyond mere association. *Id.* Agent Perry found nothing analogous to Means's room key in Hansen's room amidst evidence of drug dealing. Also like Bryant, "nothing suspicious was observed in [Defendant's luggage or] room," which "tend[s] to negate probable cause" as to him. *Id.* The *Hansen* case thus strongly indicates that Defendant's arrest, like Bryant's, was unsupported by probable cause.

The *Gordon* and *Springfield* cases provide examples of circumstances establishing the probable cause *Di Re* and *Hansen* require, and highlight the absence of such circumstances in this case. In *Gordon*, 173 F.3d at 761, an Amtrak case, the Tenth Circuit upheld the trial court's determination that there was probable cause to arrest the defendant, where the arresting officer

knew the defendant: (a) purchased a one-way ticket with cash minutes before the train departed; (b) was traveling under another name; (c) was carrying a large amount of cash; and (d) was carrying two brick-shaped, cellophane-wrapped packages, "a type of packaging commonly used to transport narcotics." *Id.*  "This combination of facts could lead a reasonable officer to believe [the defendant] was committing or had committed a crime." *Id.*

In the present matter, the facts known to Agent Perry at the time of Defendant's arrest do not rise to the level of the incriminating information known to the arresting officer in *Gordon*. While Agent Perry knew that Defendant had purchased a one-way ticket in cash, the ticket was purchased several days in advance of travel, and Defendant provided a plausible explanation for its being one-way, specifically, that he and Ms. Torres were picking up a car that belonged to her and driving it back to California. Agent Perry did not know that Defendant was traveling under another name at the time of his arrest. Defendant was not traveling with a large amount of cash, or brick-shaped packages, or anything even vaguely suspicious, as Agent Perry confirmed by searching his and Ms. Torres' possessions. In short, *Gordon* illustrates the level of incriminating evidence needed to elevate a one-way cash ticket from mere suspicion to probable cause, and that evidence is lacking here.

Likewise, in *Springfield*, the Tenth Circuit identified several incriminating factors in addition to "mere propinquity" to find a connection between the defendant and the contraband at issue, and therefore probable cause. 196 F.3d at 1183. These factors included that:

> (1) defendant engaged in furtive actions in the rear of the van as [the officer] followed the vehicle; (2) defendant was a passenger in a vehicle with invalid tags; (3) the police found drugs and a gun in defendant's vicinity within the van; (4) the other occupants of the van looked to defendant for guidance and followed his lead; and, (5) defendant was a violent felon.

*Id.* at 1183. These factors demonstrated not only that the defendant was associated with suspected criminals, but also that he was tied to the criminal activity at issue, not least because drugs were found within his reach. *Id.*

In contrast, in this case, Agent Perry did not find Defendant near the methamphetamine concealed in the laptop case in Mr. Rodriguez-Mesa's and Ms. Camacho's room, did not see Defendant engage in any "furtive" behavior in the contraband's vicinity, did not see any of Defendant's alleged traveling companions interact with him in any way, much less look to him for guidance or follow his lead, and did not have any information that Defendant had a criminal history. Considering all of the circumstances known to Agent Perry, both supporting and negating probable cause, all Agent Perry really had was Defendant's cash purchase of his ticket, his association with Mr. Rodriguez-Mesa and Ms. Camacho, and his denial that he was traveling in the same room with them. This is not enough to establish a nexus between Defendant and Mr. Rodriguez-Mesa's methamphetamine; and, the fact that "nothing suspicious was observed in [Defendant's luggage or] room" further dissipates any suspicion that would otherwise attach to Defendant from these facts. *Hansen*, 652 F.2d at 1390.

In this case, the totality of the circumstances, including Defendant's propinquity to Mr. Rodriguez-Mesa and Ms. Camacho, his one-way ticket purchased with cash, his denial that he was traveling in the same room with anyone other than Ms. Torres, and the absence of anything suspicious in his room and luggage, do not support the belief in a prudent, cautious, trained officer that Defendant was connected to the drugs concealed in the laptop case in Mr. Rodriguez-Mesa's and Ms. Camacho's room. Defendant has therefore shown that Agent Perry lacked probable cause to believe that Defendant had committed or was committing the offense of conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846.

**B.     Agent Perry did not have probable cause to arrest Defendant for making a false statement in violation of 18 U.S.C. § 1001.**

The Court must also consider the government's *post hoc* justification for Agent Perry's arrest of Defendant, that Agent Perry had probable cause to arrest Defendant for making a false statement in violation of 18 U.S.C. § 1001.  "An arrest is not invalid under the Fourth Amendment simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking, so long as the circumstances, viewed objectively, justify the arrest."  *Howards v. McLaughlin*, 634 F.3d 1131, 1142 (10th Cir. 2011), *rev'd on other grounds by Reichle v. Howards*, 132 S. Ct. 2088 (2012).  In *Howards*, the Tenth Circuit found that agents had probable cause to arrest the plaintiff for making a false statement in violation of 18 U.S.C. § 1001, even though they intended to arrest him for different offenses.  *Id.*  The government claims that similar circumstances justify Agent Perry's arrest of Defendant in this case.

According to the government, Agent Perry had probable cause to arrest Defendant for violating 18 U.S.C. § 1001 because he denied that he and Ms. Torres were "traveling with" anybody else.[7]  The elements of a violation of 18 U.S.C. § 1001 are:

(1)   the defendant made a false statement to the government;
(2)   the defendant knew the statement was false when he made it;
(3)   the defendant made the statement willfully, *i.e.*, deliberately, voluntarily, and intentionally;
(4)   the statement was in a matter within the jurisdiction of a federal agency; and,
(5)   the statement was material to the agency, *i.e.*, it had a natural tendency to influence or was capable of influencing a decision of the entity.

*United States v. Kingston*, 971 F.2d 481, 486 (10th Cir. 1992).  If a government agent's question is arguably ambiguous, then "the government bears the burden to negate any reasonable interpretations that would make a defendant's [answer] factually correct."  *United States v.*

---

[7] Defendant has not been charged with this offense.

16

*Schulte*, 741 F.3d 1141, 1153 (10th Cir. 2014). Moreover, a defendant's limitations in speaking or understanding English will naturally heighten any ambiguity. *Cf. United States v. Causevic*, 636 F.3d 998, 1006 (8th Cir. 2011) ("Though there is evidence that [the defendant] had some difficulty with the language, that evidence did not compel a reasonable juror to find that he did not understand the questions.").

The totality of the circumstances proved at the suppression hearing do not warrant the belief in a prudent, cautious, and trained officer that Defendant violated each element of 18 U.S.C. § 1001. As noted above, it would have been apparent to such an officer that Defendant reasonably understood Agent Perry to be asking if he and Ms. Torres were traveling in the same room with anybody else, when Agent Perry asked if they were "traveling with" anybody else. It would also have been apparent to such an officer that English was not Defendant's primary language and that he did not understand Agent Perry with complete fluency. In these circumstances, a prudent, cautious, trained officer could not have believed that Defendant's denials were in fact false, much less knowingly *and* willfully false as required to support a violation of 18 U.S.C. § 1001. Section 1001 cannot be read so broadly as to support a finding of probable cause to arrest whenever a non-English speaker answers a federal officer's ambiguous question reasonably but in a way the officer deems incorrect. Defendant has therefore shown that Agent Perry lacked probable cause to arrest him for making a false statement to the federal government in violation of 18 U.S.C. § 1001.

**C.     The evidence obtained as a result of Defendant's arrest, including evidence of his fingerprints and identity, should be suppressed as fruit of the poisonous tree.**

Defendant having shown that he was arrested without probable cause, and there being no dispute that the evidence he seeks to suppress is a product of that Fourth Amendment violation, the Court turns to the question of whether the evidence should be suppressed as fruit of the

poisonous tree. As discussed above, at this point in the Court's analysis, the burden of proof shifts to the government to demonstrate that the evidence in question is *not* fruit of the poisonous tree. *Williams*, 356 F.3d at 1272. More particularly, in this instance, the government's burden is to demonstrate that "no part of Defendant's arrest or subsequent fingerprinting involved an exploitation of his unlawful detention for the purpose of linking him to any illegal activity, including his suspected unlawful presence in the United States." *Perez-Partida*, 773 F.Supp.2d at 1068.

The government has failed to carry this burden. At the evidentiary hearing on Defendant's motion to suppress, the government presented no evidence regarding why Agent Perry had Defendant's fingerprints taken and run, thereby revealing his identity and alleged immigration status. Although Agent Perry's motives are directly at issue, and although he took the stand, the government elicited no testimony from him regarding what his objectives were in taking these actions. "We are unable to conclude that the government's complete failure to meet its burden can support a finding in its favor." *United States v. Achana-Suaso*, 568 F. App'x 627, 631 (10th Cir. 2014)[8]; *see also United States v. Guevara-Martinez*, 262 F.3d 751, 756 (8th Cir. 2001) ("The absence of evidence that the fingerprinting resulted from routine booking, and the concomitant inference that an [immigration]-related purpose motivated the fingerprinting…counsel in favor of applying the exclusionary rule."); *compare United States v. Moya-Maute*, 735 F.Supp.2d 1306, 1347 (D.N.M. 2008) (declining to suppress fingerprint evidence where agent testified that "such a procedure is usually what is done in the course of his duties when he makes an arrest").

---

[8] Unpublished decisions are not binding precedent in the Tenth Circuit, but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

Moreover, further fact-finding on this issue would be inappropriate. Although the Tenth Circuit in *Olivares-Rangel* remanded the case to the district court for further fact-finding,

> *Olivares-Rangel*…is now well-established precedent, and it is also well-established that the government bears the burden of proving that illegally obtained evidence is admissible. Despite [defendant's] references to *Olivares-Rangel* in his motion to suppress and arguments in the government's response that reflected its familiarity with the *Olivares-Rangel* standard, the government made no effort to introduce the evidence required by our precedent. We do not invite an open season for the government to make the record that it failed to make in the first instance.

*Achana-Suaso*, 568 F. App'x at 631 (citations omitted). Precisely the same circumstances are present here; both the government and Defendant cited and discussed *Olivares-Rangel* in their briefs, but the government made no effort to introduce the evidence this precedent required. (*See* Doc. 16 at 8; Doc. 20 at 11-13; Doc. 23 at 4-6; Doc. 27 at 4-5.) Like the Tenth Circuit, this Court declines to "invite an open season for the government to make the record that it failed to make in the first instance." *Id.* The United States has failed to show that the evidence in question was sufficiently attenuated from Defendant's illegal arrest to purge the taint of the Fourth Amendment violation, and the Court therefore recommends that the evidence be suppressed.

### V.  Proposed Disposition

The Court concludes the following:  (1) Agent Perry lacked probable cause to arrest Defendant for conspiracy with intent to distribute methamphetamine; (2) Agent Perry lacked probable cause to arrest Defendant for making a false statement in violation of 18 U.S.C. § 1001; (3) the evidence sought to be suppressed was the product of Agent Perry's illegal arrest of Defendant; and, (4) the evidence sought to be suppressed was fruit of the poisonous tree. The Court therefore recommends that all evidence obtained as a result of Defendant's illegal arrest,

including evidence of his fingerprints, identity, and immigration status, be suppressed because it was obtained in violation of the Fourth Amendment.

The parties are notified that within fourteen (14) days of service of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(a)(1)(B) and Federal Rule of Criminal Procedure 59(b). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants the assigned district judge to review the proposed findings and recommended disposition. If no objections are filed, no review will be allowed.

*Kirtan Khalsa*

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE