UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION

UNITED STATES OF AMERICA,   )   CASE NO:  14-CR-4223-MCA
                             )
              Plaintiff,   )      CRIMINAL
                             )  Albuquerque, New Mexico
     vs.                )  Monday, January 26, 2015
                             ) ( 9:38 a.m. to  9:40 a.m.)
PEDRO ROMERO-VEGA,     ) ( 9:57 a.m. to 10:01 a.m.)
                             ) (10:04 a.m. to 10:07 a.m.)
              Defendant.   ) (11:31 a.m. to 12:58 p.m.)
                             ) ( 1:19 p.m. to  1:29 p.m.)


MOTION TO SUPPRESS

BEFORE THE HONORABLE KIRTAN KHALSA,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:           JOHN G. CREWS, II, ESQ.
                            PAUL MYSLIWIEC, ESQ.
                            U.S. Attorney's Office
                            District of New Mexico
                            P.O. Box 607
                            Albuquerque, NM 87103


For Defendant:           ERLINDA O. JOHNSON, ESQ.
                            1110 Second Street NW
                            Albuquerque, NM 87102


Court Reporter:          Recorded; Liberty - Cimarron

Courtroom Clerk:        E. Hernandez

Interpreter:            M. Kagan / H. Orive

Transcribed by:         Exceptional Reporting Services, Inc.
                            P.O. Box 18668
                            Corpus Christi, TX 78480-8668
                            361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

## INDEX

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KEVIN SMALL | 8 | 12 | | |
| JARRELL PERRY | 18 | 54 | 72 | |

| GOVERNMENT'S EXHIBITS | RECEIVED |
|---|---|
| 1, 2, 3 | 51 |

1        **Albuquerque, New Mexico; Monday, January 26, 2015; 9:38 a.m.**

2   **(Hearing in progress)**

3            **THE COURT:**  Liz, if you could track down the

4   interpreter.  So we'll take a brief recess to do that.

5        **(Recess taken from 9:40 a.m. to 9:57 a.m.)**

6            **THE COURT:**  There was no interpreter flagged on the

7   docket and so there was no arrangement to have an interpreter

8   here.  And the only two interpreters are in other courtrooms,

9   so we're going to work on getting an interpreter.  But is the

10  Defendant, does he have the chains on?  Okay, yeah.  So I don't

11  want him to have to sit here waiting for an hour.  I don't know

12  how long it's going to take to get an interpreter.  So Liz is

13  going to communicate with the other courtrooms to find out real

14  quick.  Have you messaged them?  Yeah, if you could do that.  I

15  apologize.

16       **(Judge/Clerk confer regarding interpreter availability)**

17       **(Pause)**

18           **THE COURT:**  The interpreters that are here today for

19  the Court, both of whom are booked most of the morning.  We --

20  the earliest it looks like we can get someone is 11:15-ish.

21  He's booked over at Gould until 11:00 o'clock.  We're working

22  on seeing if we can bring a contract interpreter sooner.  I

23  have some afternoon hearings that I can move.  If the parties

24  want, we can start as soon as we can get an interpreter over

25  here by 11:15 and work through lunch, or we can break at lunch

1 and I can move my afternoon hearings.  And I apologize to

2 everybody about this inconvenience.  But do you all have any

3 scheduling conflicts that would prevent you from --

4       **MR. CREWS:**  I do not, your Honor.  We (indiscernible)

5 the Court's convenience.

6       **THE COURT:**  Okay.

7       **MS. JOHNSON:**  Your Honor, I just would like to

8 inquire of the Government how long they think that they will

9 take, because I do have some scheduling conflicts, but I may be

10 able to move some stuff around, but it just -- it all depends

11 on how long they're going to take.  I don't have any witnesses.

12       **MR. CREWS:**  Your Honor, I would assume we would take

13 45 minutes, perhaps an hour at most for our portion.

14       **THE COURT:**  Okay.

15       **MS. JOHNSON:**  So we could probably finish in about

16 two hours.  I can make myself available at 11:00, 11:15, your

17 Honor, if we can work through lunch, because I do have a 2:00

18 o'clock.

19       **THE COURT:**  Okay, all right.  So why don't we recess

20 then and we'll come back at let's say --

21       **MR. SPEAKER:**  (Indiscernible)

22       **THE COURT:**  Oh, sorry.

23       **MR. SPEAKER:**  If I may, my daughter just text me.

24 She's sick.  If I could go to school, pick her up, take her

25 home, and come right back, that would probably take less than

1    an hour.

2              THE COURT:  Okay.

3              MR. CREWS:  If that's fine.

4              THE COURT:  Yes.  So why don't we come back at 11:30.

5    Will that work for everyone?  And we can go until 1:30, 1:45,

6    if necessary?  Okay, all right.  And I apologize again to

7    everybody.  If you could just explain to your client what

8    happened.  All right, I'll see you all back at 11:30.

9          **(Recess taken from 10:07 a.m. to 11:31 a.m.)**

10             THE CLERK:  The Court is back in session.

11             THE COURT:  All right, we're here on *United States of*

12   *America versus Pedro Romero-Vega.*  If the parties could enter

13   their appearances?

14             MR. CREWS:  Yes, your Honor, John Crews on behalf of

15   the United States.

16             MR. MYSLIWIEC:  Also Paul Mysliwiec for the United

17   States.  Good morning, your Honor.

18             THE COURT:  Good morning.

19             MS. JOHNSON:  Good morning, your Honor, Erlinda

20   Johnson on behalf of Defendant, Romero-Vega, who appears before

21   the Court and now assisted by a court certified interpreter.

22             THE COURT:  Good morning.  Good morning, sir.  If you

23   could swear the interpreter?

24         **(Interpreter sworn)**

25             THE COURT:  Mr. Romero-Vega, if at any time you can't

1    understand the interpreter, or that device starts to fail,

2    please alert the Court immediately.

3              **THE DEFENDANT:**  Of course, I will.

4              **THE COURT:**  And can you hear presently?

5              **THE DEFENDANT:**  Yes.

6              **THE COURT:**  Okay, all right.  All right, you may

7    proceed.

8              **MS. JOHNSON:**  Your Honor, before we proceed, I would

9    invoke the rule.

10             **THE COURT:**  Okay.

11             **MR. CREWS:**  Your Honor, we have two witnesses:

12   Financial Investigator Kevin Small and Special Agent Jarrell

13   Perry.  Jarrell Perry is sitting here and I ask that he be

14   designated as the case agent.  And our first witness will be

15   Mr. Small.

16             **THE COURT:**  Okay, all right.  Because -- do you have

17   any objection?  Mr. Perry is designated as the case agent,

18   so --

19             **MS. JOHNSON:**  I do, your Honor.  This is a way of

20   getting around the rule and keeping a witness in so they can

21   hear what the other one is saying.  So I understand he's been

22   designated (indiscernible) to Agent Perry remaining in the

23   courtroom.

24             **THE COURT:**  And is there any reason at this time

25   that, from the Government's perspective, that Agent Perry needs

1   to be present at counsel table?

2          **MR. MYSLIWIEC:**  The case agent is immune to the rule

3   of sequestration, your Honor.  No further reason is necessary.

4          **THE COURT:**  Okay, all right.  Well, given the fact

5   that the agent has been designated as the case agent, and

6   noting the Defendant's objection, the Government can proceed.

7          **MR. CREWS:**  I call special -- Financial Investigator

8   Kevin Small, please.

9          **KEVIN SMALL, GOVERNMENT'S WITNESS, SWORN**

10         **THE CLERK:**  Please have a seat, state your name, and

11  your last name for the record.

12         **THE WITNESS:**  My name is Kevin Small, the last name

13  is spelled S-M-A-L-L.

14         **MS. JOHNSON:**  Your Honor, I'm sorry to interrupt.

15  Just before we proceed -- and this is a matter that actually

16  came to my attention on Friday, at least that's when I learned

17  that the Government would be calling Mr. Small.  And maybe this

18  is an issue for cross examination and it may be an issue that

19  we need to brief further, but he is no longer a law enforcement

20  officer but yet still performing enforcement duties.  So I

21  would ask that the Court (sic) proffer to the -- that the

22  Government proffer to the Court what authority Mr. Small is

23  doing enforcement duties under for the DEA, still doing what he

24  was doing as a special agent when he was an agent with the DEA.

25         **THE COURT:**  All right.  I imagine that if the

Small - Direct / By Mr. Crews                              8

1  Government doesn't get into that and establish what -- under

2  what authority he was acting, that you will get into that issue

3  on cross examination.

4           **MR. CREWS:**  Thank you, your Honor.  May it please the

5  Court, counsel.

6                        **DIRECT EXAMINATION**

7  **BY MR. CREWS:**

8  Q    Mr. Small, let me direct your attention back to the 28th

9  of October, 2014.  Were you working on that day?

10 A    Yes, I was.

11 Q    In what capacity?

12 A    I'm a contractor for a company called Professional Risk

13 Management, a subcontractor with a company called Maximus, and

14 I'm a Financial Investigator at the Albuquerque District Office

15 of the Drug Enforcement Administration.

16 Q    And would you tell me what your duties are as a financial

17 investigator?

18 A    To assist case agents on the intelligence side of

19 financial assets, as locating assets, assist in the seizure of

20 the assets, helping them prepare maybe seizure warrants,

21 subpoenas, that kind of thing.

22 Q    Are you armed?

23 A    No, I am not.

24 Q    Do you have any law enforcement authority?

25 A    None whatsoever.

1   Q    All right.  And back on the 28th of October, 2014, did you

2   become involved in an investigation that led us to be here

3   today?

4   A    Yes.

5   Q    All right.  And what activities did you first -- where did

6   you go?

7   A    I went to the office and worked a report about 8:30, 9:00

8   o'clock.  And about noon, 11:45, noon sometime, I went down to

9   the Amtrak train station where I met Special Agent J. Perry,

10  and to assist him.  He works interdiction at the Amtrak train

11  station.

12  Q    All right.  And after you got to the Amtrak station, did

13  you anticipate meeting a train there at a particular time?

14  A    Yes.  Amtrak train number four arrives -- on that day

15  arrived I think probably a little later, but it arrives

16  anywhere from 10:45 until noon in the morning.  And Agent Perry

17  had a couple reservations that he thought looked good and I was

18  assisting with -- however I could.

19  Q    All right.  And did there come a time where you got on a

20  train?

21  A    Yes.

22  Q    And will you tell us about that, please?

23  A    The train arrived originally -- and J. Perry had told me

24  about the reservations.  Agent Perry told me he had two couples

25  traveling out of California down to Orlando, Florida, and they

1  were in separate rooms.  And Agent Perry asked me if I --

2  Q    Were they in separate rooms or separate cars or both?

3  A    They were in separate rooms and in separate cars,

4  according to the reservation.

5  Q    All right.  And what did you do once you became aware of

6  that information?

7  A    Agent Perry asked me -- directed me to go to one of the

8  cars and talk to the car attendant and ask him --

9  Q    Well, let me stop you there.  What's a car attendance, for

10 those of us who haven't traveled on an Amtrak train?

11 A    The Amtrak train consists of three sleeper cars at that

12 time and probably four coach cars.  And a car attendant is the

13 Amtrak employee that rides the train from Los Angeles all the

14 way to its destination in Chicago.  They don't get off the

15 train at all.  They are there for the three days.  And each

16 sleeper car attendant has a car attendant that's like a butler,

17 and their job is to take care of those people in that sleeper

18 car, make up their beds, make their dinner reservations.  When

19 they go to dinner, they make their beds down, put their pillow

20 out, put a chocolate mint on their pillow.  And in the morning,

21 when they go to breakfast, they go into the room, clean their

22 room up like a butler does, and put your seats back up in the

23 proper position so you can use it as a sitting room.

24 Q    Let me stop you for a moment.  Prior to becoming a

25 financial investigator contracted to work with the Drug

1   Enforcement Administration, what did you do?

2   A    I was an agent for the Drug Enforcement Administration for

3   31 years, all 31 years here in the Albuquerque, New Mexico

4   District Office.

5   Q    And what were your duties principally the last part of

6   your career with DEA?

7   A    From 1987 to the day I retired, I worked drug interdiction

8   either at the Amtrak train, Greyhound bus, or at the truck

9   stops on Interstate 40.

10  Q    So going on the train was something you had done before?

11  A    Yes, sir.  I actually started the unit in 1988.  Myself

12  and a local sheriff's deputy went down to Amtrak in 1988 where

13  we started the Amtrak Unit.

14  Q    All right.  And did you have occasion to talk to the car

15  attendant in one of the sleeping cars?

16  A    Yes, I did.

17  Q    All right, and what information did you obtain?

18  A    I asked him about the room in question that Agent Perry

19  gave me the room number on.  And the car attendant at that time

20  told me that she had moved them to the transition sleeper, I

21  believe it was.  And we had a conversation and she goes, "I

22  moved them.  There's two couples that are traveling together

23  and I moved them in rooms side-by-side."  And she told me, "You

24  know they're traveling together, don't you?"  I said, "Yes, I

25  do."  And she told me she believed that one of the couples was

1   taking a shower, because on the train there's showers, not in

2   their room but down below on the first floor.  And she thought

3   maybe one of the couples maybe taking a shower.  And then she

4   told me again, "You know they're traveling together, don't

5   you?"  I said, "Yes, I do."  And then I went to Agent Perry and

6   relayed that information.

7   Q    All right.  And who requested the room change from one car

8   back to the other car?

9   A    She didn't tell me who requested it.  She told me that she

10  put the people in her car up to the transition sleeper.  And I

11  -- at that time, I wasn't real familiar with the passengers'

12  names.  I'd seen the reservations but I couldn't remember their

13  names.  One was named Carrillo and the other guy's name right

14  now escapes my memory.  It was two couples, a man and a woman,

15  and a man and a woman.

16          **MR. CREWS:**  Pass the witness, your Honor.

17          **MS. JOHNSON:**  Good morning, Mr. Small.

18          **THE WITNESS:**  Good morning.

19                    **CROSS EXAMINATION**

20  BY MS. JOHNSON:

21  Q    Mr. Small, you were working as Agent Perry's partner that

22  day, were you not?

23  A    No.

24  Q    So you don't -- did you review the recording of the

25  encounters in this case?

Small - Cross / By Ms. Johnson                    13

1   A    Yes.

2   Q    You don't recall hearing a portion of the encounter where

3   Agent Perry refers to you as his partner?

4   A    Yes, he did refer to me as his partner.

5   Q    What law enforcement authority do you have?

6   A    Absolutely none.  I already testified to that.

7   Q    And you assisted him with making arrests in this case, in

8   fact, the arrest of Mr. Romero-Vega.

9   A    He directed me to make the arrest.  I did not assist.  He

10  ordered me -- gave me an order to help him out and I helped him

11  out.

12  Q    But you have no law enforcement authority?

13  A    That's correct.

14  Q    And under what authority do you go to the train to work

15  doing what you did when you were a special agent?

16  A    As a special agent?

17  Q    No, when you -- now.

18        MR. CREWS:  Your Honor this doesn't really have

19  anything to do with probable cause.

20        MS. JOHNSON:  This may be an issue, your Honor, that

21  it -- I haven't researched it yet, but this may be an issue,

22  that if we have a civilian essentially doing law enforcement

23  duties, that may taint the arrest that is performed in this

24  case.  And he just testified that he placed my client under

25  arrest at the direction of Agent Perry.

1          **MR. CREWS:**  And, your Honor, we can recess the

2    hearing and resume at another time after this has been briefed

3    and we've had a chance to respond.  This was not the subject of

4    this motion to suppress.

5          **THE COURT:**  I'm going to allow the question.

6          **MS. JOHNSON:**  Thank you.

7    **BY MS. JOHNSON:**

8    Q    Mr. Small, under what authority do you go to the train now

9    as a civilian to do enforcement work?

10   A    I just said I don't do enforcement work.  I just answered

11   that question.

12   Q    But you worked as backup for Agent Perry.

13   A    I did not say that; you said that.  I do not work as

14   backup as (sic) Agent Perry.

15   Q    But you were working as backup for Agent Perry on October

16   28th, 2014, were you not?

17   A    No, I answered that question twice now.  I was not his

18   backup.

19   Q    But yet he referred to you as his partner.

20   A    Because people don't know -- I mean, yeah, to the generic

21   public, they'd have to tell them something.

22   Q    So the answer would be yes.

23   A    The answer would be yes to what?

24   Q    He referred to you as his partner.

25   A    He did, it's on the tape.

1   Q    And you arrested Mr. Romero-Vega?

2   A    I put handcuffs on him.  Agent Perry actually arrested

3   him.

4   Q    Now, let's talk about October 28th.  You didn't do a

5   police report?

6   A    No.

7   Q    You didn't write a police report?

8   A    I'm not a police officer.

9   Q    You didn't write any report.

10  A    No.

11  Q    You didn't write any report documenting your conversation

12  with the car attendant?

13  A    No, I did not.

14  Q    And who was the car attendant?

15  A    I could not tell you her name.  I don't know today who

16  that was.

17  Q    And you testified that she allegedly told you, "You know

18  they're traveling together?"

19  A    Yes.

20  Q    And, in fact, she said that twice?

21  A    She actually said it three times to me.

22  Q    And you testified that you relayed that information to

23  Agent Perry?

24  A    Yes.

25  Q    But yet you didn't write a report?

1   A     That's correct.

2   Q     Now, prior to you arriving at the Amtrak train station

3   that day, you didn't have any information about Mr. Romero-

4   Vega, did you?

5   A     I did not prior to arriving, no.

6   Q     And when you in fact arrived, the only information that

7   you obtained was that from the car attendant.

8   A     No, I received information from Special Agent Perry.

9   Q     But other than what Special Agent Perry told you, you

10  didn't have any independent information.

11  A     No, I did not.

12  Q     And did you have an opportunity to run any NCIC checks

13  prior to going to the train station?

14  A     I did not.  That -- I was hoping I was going to have an

15  opportunity to do that at the train.  That's where I go.  I

16  have my cell phone with me in case Agent Perry needs to me run

17  something.  That's my job.

18  Q     And you didn't do that that day?

19  A     Agent Perry didn't ask me to run anything.

20  Q     And when did you check the PNR for the train arrival that

21  day?

22  A     I did not check it.  Agent Perry had the information and I

23  reviewed it at the train station.

24  Q     And all you reviewed was two reservations for two

25  different couples, right?

1    A    Yes.

2    Q    One you testified by the name of Kevin.

3    A    Kevin Carrillo --

4    Q    Carrillo --

5    A    -- because I remember we talked about him having the same

6    name I have, we talked about that.  He was traveling with a

7    woman.  And there was another couple in a separate sleeper

8    making the same journey.  They were traveling from Fullerton,

9    California to Orlando, Florida.

10   Q    So prior to -- and they were in a separate sleeping car,

11   right?

12   A    In separate sleepers and sleeping car -- rooms.

13   Q    So prior to approaching and encountering Mr. Romero-Vega,

14   that's all the information that you all had, right?

15   A    Yes.  I knew when they bought their tickets, how they

16   bought their tickets, that kind of stuff, but that's all we

17   had.

18        **MS. JOHNSON:**  I have no further questions, your

19   Honor.

20        **MR. CREWS:**  No redirect, your Honor.

21        **THE COURT:**  All right, you're excused.  Thank you.

22        **(Witness excused)**

23        **MR. CREWS:**  I call Special Agent Perry, your Honor.

24        **THE COURT:**  All right.

25   //

1          **JARRELL PERRY, GOVERNMENT'S WITNESS, SWORN**

2          **THE CLERK:**  Please state your name and spell your

3    last name for the record.

4          **MR. MYSLIWIEC:**  I just want to note for the record

5    while the new witness is still taking his seat that Mr. Small,

6    as per the rule of sequestration, has left the courtroom.

7          **THE COURT:**  Okay, all right.  You may proceed.

8          **MR. CREWS:**  May it please the Court, counsel.

9                       **DIRECT EXAMINATION**

10   BY MR. CREWS:

11   Q    Would you state your name for the record, please, and

12   spell your last name?

13   A    My name is Jarrell Perry, last name is P-E-R-R-Y.

14   Q    And how are you employed?

15   A    I'm a special agent with the Drug Enforcement

16   Administration.

17   Q    And how long have you been with the DEA?

18   A    Approximately 16 and a half years.

19   Q    All right, and what are your principal duties with the

20   DEA?

21   A    I work in -- well, we used to have a unit we called the

22   Interdiction Unit, but it's not really a unit anymore.  We have

23   a couple people still doing it, but I specifically work

24   interdiction at various means of public transportation here in

25   Albuquerque.

Perry - Direct / By Mr. Crews                    19

1  Q    All right, and how long have you been working interdiction

2  enforcement?

3  A    In March of this year will be 15 years.

4  Q    All right.  And let me direct your attention back to the

5  28th of October.  Were you working that day?

6  A    Yes, sir, I was.

7  Q    And did you become involved in an investigation that leads

8  us to being here today?

9  A    Yes, sir, I did.

10  Q    And can you tell us how that began?

11  A    It began by I reviewed various passenger name records --

12  we refer to them as PNRs -- passengers that were traveling on

13  the Amtrak train number four, the eastbound train that arrives

14  here in Albuquerque.

15  Q    Now, for those of us who haven't traveled on Amtrak, can

16  you tell us -- give me the background?

17  A    Of a PNR?

18  Q    Right.

19  A    Yes, sir.  Basically a PNR is an itinerary just like you

20  would make when you fly.  It's basically you have a manifest of

21  all the passengers on the train.  A PNR is a specific

22  reservation.  It can be for one person or more than one person,

23  but if they're traveling together, it reflects various

24  information about their travel, where they're traveling from,

25  where they're traveling to, the names, when they made their

1  reservation, how they paid for it, a contact telephone number,

2  and the history of basically whether they called in, did it on

3  the internet, walked up to the train station to pay for their

4  ticket.  Basically it's an itinerary for a passenger on the

5  train.

6  Q    All right.  And as you reviewed that information, what, if

7  anything, caught your eye?

8  A    Well, I reviewed two different reservations.  Actually, I

9  reviewed other reservations.  But two reservations that caught

10  my eye, there was one reservation under the name of Stephany

11  Torres and Kevin Carrillo.  It reflected one-way travel from

12  Fullerton, California to Orlando, Florida.  It was one-way, it

13  was paid for with cash, $1,988, it was paid for -- it was

14  actually -- they walked up to the train station in Fullerton,

15  California and made the reservation at 3:29 p.m.  They actually

16  picked up their tickets in Los Angeles, the following day,

17  which would be the 22nd of October, at 3:11 p.m.  And then they

18  boarded the train in Fullerton, California on the 27th, which

19  was one day prior to me reviewing it, and their tickets were

20  scanned at 7:46 p.m.  That was one PNR, or one reservation.

21  The second reservation was under the name of Miguel Rodriguez

22  and Tyra Camacho.  It basically was almost the same identical

23  as the other reservations I referred to earlier.  It was at

24  3:30 p.m. in Fullerton, California, they made a reservation,

25  and at 3:11 p.m. in Los Angeles the following day, they

1   actually paid $1,988 cash for their tickets.  It was one-way

2   also from Fullerton, California to Orlando, Florida.  Let me

3   back up.  I forgot to say on the first reservation it reflected

4   travel in a sleeper car, which was in sleeper car 431, bedroom

5   number ten.  The second reservation for Rodriguez and Camacho

6   was in what we referred to as the transition, or the crew car.

7   It was in sleeper car 440, bedroom number 20.  So it was in two

8   different cars, two different sleepers.  The second reservation

9   for Camacho and Rodriguez was actually scanned at exactly 7:46

10  p.m.  by  the conductor  on the train in Fullerton,

11  California.  That's  the  two  reservations  that  stood  out

12  in  my  mind.

13  Q    Now, how many times over the past 14 years or so have you

14  reviewed PNRs from Amtrak?

15  A    I wouldn't say thousands, but hundreds, maybe thousands --

16  a lot.  That's pretty much what I do on a daily basis unless

17  I'm busy in court or something else.

18  Q    Now, does Amtrak run -- can you in fact travel from

19  Fullerton, California to Orlando, Florida?

20  A    I'm sorry, sir, I couldn't hear your question.

21  Q    Can you travel on Amtrak from Fullerton, California, the

22  Los Angeles region, to Orlando, Florida?

23  A    Yes, sir, you can.

24  Q    All right.  And over the many hundreds of tickets that you

25  have observed over a decade and a half, how many times have you

Perry - Direct / By Mr. Crews                                    22

1   come across people traveling from Fullerton, California to

2   Orlando, Florida on the train?

3   A    Specifically from Fullerton to Orlando?  There may have

4   been other ones, but I'm not exactly sure specifically from

5   Fullerton, but I reviewed a few people -- probably less than

6   five people -- that were traveling actually to Orlando from Los

7   Angeles and other stations.

8   Q    All right.

9   A    It's not a -- as I would refer to it, it's not a big

10  destination for people traveling specifically on this train.

11        **MS. JOHNSON:**  Your Honor, I'm going to object and ask

12  that the Court strike that testimony for lack of foundation and

13  speculation.

14        **MR. CREWS:**  I don't know if that's -- I'm happy to

15  argue that, but it simply his impression and his -- what he has

16  observed.

17        **THE COURT:**  All right, I'm not going to strike that.

18  **BY MR. CREWS:**

19  Q    Now, with that information, as the train arrived, what

20  happened then?

21  A    Myself and -- it's hard for me to call him financial

22  investigator because I worked with -- Kevin Small, who just

23  testified, for the past -- my whole career, so I refer to him

24  as "agent."  So if I refer to him as an agent, that's just by

25  mistake.  But he -- at this time, he was a Financial

Perry - Direct / By Mr. Crews                          23

1   Investigator.  I spoke with him about the reservations -- we

2   may have done it at the office or maybe at the Amtrak train

3   station -- and told him about basically what I just testified

4   to about the passengers.  And I believed from my experience,

5   and he also believed from his experience, that these passengers

6   were traveling together.

7   Q    All right, then what happened?

8   A    I informed him that I was going to go on sleeper car 440

9   and go to bedroom 20 and look at the bedroom to see if anyone

10  was in there, and I asked him if he would go to 431, bedroom

11  number ten and do the same, or speak with the car attendant.

12  The transition car that I went to, there's not a car attendant

13  specifically for that car.  Another car attendant will cover

14  that car.  So that's basically what I did.  I boarded the

15  train, went to 440 sleeper car, and walked by bedroom number

16  20; and then subsequently after that, I met with Financial

17  Investigator Small.

18  Q    All right.  And did you become aware of any information

19  from Financial Investigator Small?

20  A    Yes, sir, I did.

21  Q    And what information was that?

22  A    He informed me that he spoke with the car attendant for

23  bedroom -- or for sleeper car 431 and that he had spoken with

24  them about the passengers that were traveling in room ten.  And

25  he informed me that they had been moved to the transition car,

1  bedroom number 19, which was the bedroom directly across the

2  hallway from the reservation that I had for Ms. Camacho and Mr.

3  Rodriguez.  And the reason they were moved is because they were

4  traveling together on the train.

5  Q    All right.  And then as you continued your investigation,

6  what happened next?  Well, first let me ask you, did you

7  believe that information that Mr. Small made you aware of?

8  A    Yes, sir, I did.

9  Q    What happened next?

10 A    I went back to bedroom number 20.  When I first passed it,

11 there were two passengers in the sleeper car.  When I went back

12 after speaking with Agent Small, the bedroom was empty, and I

13 observed what the passengers looked like, then I walked out on

14 the platform and made contact with the two passengers that were

15 traveling in bedroom number 20.

16 Q    All right.  And as you began to talk with them, what

17 happened next?

18 A    I had a conversation with them.  I displayed my DEA badge

19 to them, identified myself as a police officer, asked for and

20 received permission to speak with them.  Then I asked them for

21 their tickets, and asked them various questions about their

22 travel.  When I asked them for their tickets, Mr. Rodriguez-

23 Mesa said the tickets were in his bedroom and he walked onto

24 the train, followed by Ms. Camacho, followed by me.  And he

25 retrieved the tickets from his bedroom and then handed them to

1   me in the hallway.

2   Q     And what happened then?

3   A     I asked them various questions about their travel and then

4   subsequently asked them if they were -- I asked Ms. Camacho,

5   who spoke very good English -- Mr. Rodriguez-Mesa, he spoke

6   English but I wouldn't say fluently.  He could answer my

7   questions.  But mostly the conversation was with Ms. Camacho

8   because she was -- she spoke very good English.  And I asked

9   her if she was traveling with anyone else.

10  Q     All right.  Let me interrupt you a moment.  With respect

11  to language abilities, do you speak any Spanish?

12  A     I'm not fluent in Spanish.  I can conduct a consensual

13  encounter and ask specific questions in Spanish about travel,

14  but I'm not fluent in Spanish.

15  Q     All right.  As you continued your conversation with Ms.

16  Camacho and Mr. Rodriguez, what happened next?

17  A     I subsequently asked them if they had any luggage with

18  them and then subsequently asked for consent to search their

19  luggage.

20  Q     All right, and then what happened?

21  A     I did search their luggage that was inside of the bedroom

22  after they both gave me permission and I found a compartment

23  that was inside of the small laptop case that was green in

24  color that Mr. Rodriguez had in his hands and handed to me, and

25  it had been glued together.  I opened it up and it revealed a

1    clear plastic bundle I knew from my experience that was

2    consistent with the packaging of illegal narcotics.

3    Q    All right.  And let me jump ahead for a moment.  Did you

4    ultimately field test that substance?

5    A    Yes, we did at the DEA office and it did field test

6    positive for the presence of methamphetamine.

7    Q    All right.  And it has in fact been analyzed by the

8    laboratory?

9    A    Yes, sir, it has.  The lab report has came back.

10   Q    And what was it?

11   A    It was methamphetamine.

12   Q    All right.  Now, as you -- before you found the

13   methamphetamine of Mr. Rodriguez and Ms. Camacho, did they

14   indicate they were traveling with anyone?

15   A    Ms. Camacho said that they were traveling with a friend,

16   and then we had specific -- I asked her specific questions

17   later on, if it was a male or female.  She said actually it was

18   a couple, it was a male and female that they were traveling

19   with.

20   Q    All right.  Now, after -- what happened after you found

21   the methamphetamine?

22   A    Mr. Mesa -- or Rodriguez-Mesa and Ms. Camacho were

23   handcuffed and they were placed into an empty sleeper room down

24   the hallway.

25   Q    All right.  After you did that, what did you do next?

1  A    While I was speaking with them and inside of the room

2  searching the first piece of luggage, an individual walked up

3  who then entered -- was standing in the hallway and entered the

4  bedroom directly across, which was bedroom number 19.  I asked

5  him when I -- you -- I could hear him behind me.  I turned

6  around and I saw that he was entering bedroom number 19 and I

7  asked him -- I said hi to him, asked him if he was traveling

8  with the couple, with them, and he said no, we're over here.

9  So he entered bedroom number 19.  So I knocked on the door to

10  bedroom number 19, which is the doorway that the car attendant

11  said that the other couple had been moved to that was traveling

12  with Mr. Mesa -- Rodriguez-Mesa and Ms. Camacho.  So I

13  conducted a consensual encounter with both of those passengers.

14  Q    And as you began to speak with them, what happened next?

15  A    Well, in detail, I displayed my DEA badge to them,

16  identified myself as a police officer, asked permission to

17  speak with them.  At the time, I didn't know if it was the

18  individual traveling under the name of Mr. Carrillo and then

19  Ms. Torres.  Mr. Carrillo said he spoke English.  I spoke to

20  him in English.  And Ms. Torres said that she spoke Spanish and

21  so I spoke to her in the Spanish language.  I subsequently

22  asked for their train tickets and the Defendant that we're here

23  for today handed me an Amtrak train ticket folder with tickets

24  inside.

25  Q    All right, then what happened?

1    A    I reviewed them.  When I reviewed them, Amtrak has a --

2    when you purchase tickets, they give you a white receipt that

3    is generally stapled to the ticket folder.  And I read off the

4    name of Miguel Rodriguez, which was the first name that I saw.

5    And the Defendant in this case that we're here for today, at

6    the time I believed to be Mr. Carrillo who was later determined

7    to be Mr. Romero-Vega, stated no, that's not me, and he pointed

8    to the name of Kevin Carrillo on the ticket.  So I reviewed

9    them, returned them to him.  I subsequently asked for

10   identification from both of the subjects, both gave me

11   identification.  Then I asked them various questions about

12   their travel and I asked if they were traveling with anyone

13   else.  Mr. Romero-Vega said no, they were not, they were

14   traveling by themselves.

15   Q    Let me interrupt you a moment.  We heard two names, Kevin

16   Carrillo and Romero-Vega.  The same person?

17   A    Yeah, it ended up being the same person.  At the time, the

18   ticket was under the name of Kevin Carrillo.  The

19   identification that that individual showed me was a name -- it

20   was a California identification card under the name of

21   (indiscernible) so I assume --

22   Q    And do you see that --

23   A    I'm sorry.

24   Q    Do you see the individual, Kevin Patrick Carrillo, in the

25   courtroom?

Perry - Direct / By Mr. Crews                                    29

1   A    Yes, sir, I do.

2   Q    Would you tell us where he's sitting, what he looks like,

3   wearing?

4   A    He's -- I can't see all of him, but I saw him already.

5   He's seated at defense counsel table.  He's wearing a -- I

6   don't know what color it is -- if I could stand up, please.

7   It's a red jumpsuit.  He has the earphones on, he has black

8   hair, and he's sitting beside his attorney, Ms. Johnson.

9        **MR. CREWS:**  Your Honor, I'd ask the record to reflect

10  that he's identified the Defendant, Pedro Romero-Vega.

11       **THE COURT:**  He -- you asked him to identify Kevin

12  Carrillo and he identified Kevin Carrillo.  I think you need to

13  ask one other question to indicate that he has identified Pedro

14  Romero-Vega.

15  **BY MR. CREWS:**

16  Q    Is that the individual who identified himself as Kevin

17  Carrillo to you?

18  A    Initially that's the name that I believed him to be.

19  Q    Did he subsequently identify himself as Pedro Romero-Vega

20  to you?

21  A    Yes, later on he did, and that is the same subject.

22       **THE COURT:**  Okay, the record will reflect that the

23  Defendant has been identified.

24  Q    Now, in preparation for today, did you listen to three --

25  were you wearing a recording device?

1   A    Yes, sir, I was wearing a recording device.

2   Q    All right, and have you listened to three conversations --

3   three compact disks worth of conversations?

4   A    Yes, sir, I listened to them.

5   Q    And are those true and accurate representations of the

6   conversations that occurred?

7   A    Yes, at the Amtrak train station on that day, yes.

8            **MR. CREWS:**  Your Honor, with the Court's permission,

9   I'd like to play those three different sets of conversations.

10  We have the disks -- the first one loaded into the computer so

11  we're ready to go.

12           **THE COURT:**  Okay.  Does the Defendant have any

13  objection?

14           **MS. JOHNSON:**  No objection, your Honor.

15           **THE COURT:**  All right, you may go ahead and have

16  those played.

17           **MR. CREWS:**  Thank you, your Honor.

18       **(Begin playing audio recording at 12:03 p.m.)**

19           SPECIAL AGENT PERRY:  My name is Jose (indiscernible)

20           and I'm a police officer and we check the train

21           station here.  May I speak to you for just a moment?

22           Do you speak English?

23           UNIDENTIFIED MALE 1:  (Speaks Spanish)

24       **(Stop playing audio recording at 12:03 p.m.)**

25           **THE COURT:**  I can hear that.  I didn't hear the

Perry - Direct / By Mr. Crews                    31

1  question that you just asked me.

2           **MR. CREWS:**  I'm sorry, your Honor?

3           **THE COURT:**  I thought you just asked me a question.

4  I can hear --

5           **MR. CREWS:**  Can you hear it all right?

6           **THE COURT:**  I can hear, but I couldn't hear you.

7       **(Begin playing audio recording at 12:03 p.m.)**

8           SPECIAL AGENT PERRY:  (Speaks Spanish)

9           UNIDENTIFIED MALE 1:  (Speaks Spanish)

10          SPECIAL AGENT PERRY:  (Speaks Spanish)

11          UNIDENTIFIED MALE 1:  (Speaks Spanish)

12          SPECIAL AGENT PERRY:  (Speaks Spanish)

13      **(Stop playing audio recording at 12:04 p.m.)**

14          **MR. CREWS:**  Let me stop for a moment.

15  **BY MR. CREWS:**

16  Q    Special Agent Perry, whose voice are we hearing besides

17  yours?

18  A    That is Mr. Miguel Rodriguez-Mesa.  And I don't know if

19  she's already been -- started talking, but it's Tyra Camacho.

20  You'll hear her voice shortly.

21      **(Begin playing audio recording at 12:04 p.m.)**

22          SPECIAL AGENT PERRY:  (Indiscernible)

23          MS. CAMACHO:  Huh?

24          SPECIAL AGENT PERRY:  (Indiscernible)

25          MS. CAMACHO:  (Indiscernible)

1           SPECIAL AGENT PERRY:  (Speaks Spanish)

2           MS. CAMACHO:  Yeah.

3           SPECIAL AGENT PERRY:  You speak English?

4           MS. CAMACHO:  Yeah.

5       **(Stop playing audio recording at 12:04 p.m.)**

6   **BY MR. CREWS:**

7   Q    Is that Ms. Camacho's voice?

8   A    Yes, sir, it is.

9       **(Begin playing audio recording at 12:04 p.m.)**

10          SPECIAL AGENT PERRY:  Okay, all right.  Where are you

11          coming from, ma'am?  Where did you board the train?

12          MS. CAMACHO:  We (indiscernible)

13          SPECIAL AGENT PERRY:  Is that your boyfriend or

14          husband?

15          MS. CAMACHO:  My boyfriend.

16          SPECIAL AGENT PERRY:  Boyfriend, okay.  Do you guys

17          live in Orlando or Los Angeles?

18          MS. CAMACHO:  Orlando.

19          SPECIAL AGENT PERRY:  How long were you in Los

20          Angeles, ma'am?

21          MS. CAMACHO:  We were in Los Angeles for about

22          (indiscernible)

23          SPECIAL AGENT PERRY:  Vacation or --

24          MS. CAMACHO:  Yes, vacation.

25          SPECIAL AGENT PERRY:  Oh, okay, well good for you.

1        How do you like the train?

2        MS. CAMACHO:  (Indiscernible)

3        SPECIAL AGENT PERRY:  (Indiscernible)  Did you travel

4        from Orlando to Los Angeles on the train?

5        MS. CAMACHO:  Yeah.

6        SPECIAL AGENT PERRY:  You did?

7        MS. CAMACHO:  (Indiscernible)

8        SPECIAL AGENT PERRY:  (Indiscernible) turn down the

9        other way.  Go straight.  Okay, so you speak English

10       (speaks Spanish)

11       UNIDENTIFIED MALE 1:  Yeah, a little.

12       MS. CAMACHO:  A little.

13       SPECIAL AGENT PERRY:  Okay, well, we just check the

14       train here for security, ma'am.

15       MS. CAMACHO:  Okay.

16       SPECIAL AGENT PERRY:  Just for security reasons.

17       MS. CAMACHO:  Okay.

18       SPECIAL AGENT PERRY:  And you said you traveled on

19       the train when you went to -- from Orlando to Los

20       Angeles?

21       MS. CAMACHO:  Yes.

22       SPECIAL AGENT PERRY:  All right.  Are you Rodriguez?

23       (Indiscernible) and Tyra?

24       MS. CAMACHO:  Yeah.

25       SPECIAL AGENT PERRY:  Tyra Camacho, okay.  Do you all

1        have ID with you?

2        UNIDENTIFIED MALE 1:  No.

3        SPECIAL AGENT PERRY:  (Indiscernible) may I see it,

4        please?

5        MS. CAMACHO:  Uh-huh.

6        SPECIAL AGENT PERRY:  So what did you do on vacation?

7        MS. CAMACHO:  We went to (indiscernible)

8        SPECIAL AGENT PERRY:  Where did you stay, in Los

9        Angeles or (indiscernible)

10       MS. CAMACHO:  (Indiscernible)

11       SPECIAL AGENT PERRY:  (Indiscernible)

12       MS. CAMACHO:  (Indiscernible)

13       SPECIAL AGENT PERRY:  Are you folks traveling by

14       yourself or are you traveling with anyone else?

15       MS. CAMACHO:  Just (indiscernible)

16       SPECIAL AGENT PERRY:  (Indiscernible) okay are they

17       in the same rooms up here or are they somewhere else

18       on the train?

19       MS. CAMACHO:  No, they're on the same train.

20       SPECIAL AGENT PERRY:  On the same train, okay.  Are

21       they up here in rooms with you or somewhere else?

22       MS. CAMACHO:  No (indiscernible)

23       SPECIAL AGENT PERRY:  (Indiscernible) Miguel

24       Rodriguez?

25       UNIDENTIFIED MALE 1:  (Indiscernible)

1      SPECIAL AGENT PERRY:  So you are originally from

2      Cuba?

3      UNIDENTIFIED MALE 1:  Yeah.

4      SPECIAL AGENT PERRY:  Let me ask, can I open this up

5      (indiscernible) it's hard for me to see it.  Okay,

6      and your date of birth is October (indiscernible)

7      1990?

8      UNIDENTIFIED MALE 1:  Yes.

9      SPECIAL AGENT PERRY:  (Indiscernible) Happy Birthday.

10     UNIDENTIFIED MALE 1:  (Indiscernible)

11     MS. CAMACHO:  (Indiscernible)

12     SPECIAL AGENT PERRY:  (Indiscernible)

13     MS. CAMACHO:  Camacho.

14     SPECIAL AGENT PERRY:  Well, it says (indiscernible)

15     MS. CAMACHO:  (Indiscernible)

16     SPECIAL AGENT PERRY:  (Indiscernible)

17     MS. CAMACHO:  Uh-huh.

18     SPECIAL AGENT PERRY:  Where are you originally from,

19     ma'am?

20     MS. CAMACHO:  Puerto Rico.

21     SPECIAL AGENT PERRY:  Okay, 12/28/82?

22     MS. CAMACHO:  Yes.

23     SPECIAL AGENT PERRY:  Okay, all right.  And you said

24     you're traveling with one other friend?

25     MS. CAMACHO:  Yeah.

1      SPECIAL AGENT PERRY:  Here's your ID.  Just one

2      friend?

3      MS. CAMACHO:  Yeah.

4      SPECIAL AGENT PERRY:  Is that a male or female?

5      MS. CAMACHO:  Male and female.

6      SPECIAL AGENT PERRY:  (indiscernible)

7      MS. CAMACHO:  Yeah.

8      SPECIAL AGENT PERRY:  So then they're traveling

9      (indiscernible) did they go out to California with

10     you, too?

11     MS. CAMACHO:  Yeah.

12     SPECIAL AGENT PERRY:  Oh.

13     UNIDENTIFIED MALE 1:  On vacation.

14     SPECIAL AGENT PERRY:  Vacation, okay.  Well, listen,

15     just to let you know, we just check the train for

16     security reasons.  Do you and your boyfriend have any

17     luggage with you, ma'am?

18     MS. CAMACHO:  Our luggage?

19     SPECIAL AGENT PERRY:  Yes.

20     MS. CAMACHO:  Yeah.

21     SPECIAL AGENT PERRY:  Where's your luggage located?

22     MS. CAMACHO:  The bedroom.

23     SPECIAL AGENT PERRY:  (Indiscernible) how many pieces

24     of luggage do you have downstairs?

25     MS. CAMACHO:  Two.

Perry - Direct / By Mr. Crews                    37

1    SPECIAL AGENT PERRY:  Two down there?

2    MS. CAMACHO:  Uh-huh.

3    SPECIAL AGENT PERRY:  And this is you all's bedroom

4    here?

5    MS. CAMACHO:  Yeah.

6    SPECIAL AGENT PERRY:  Do you have luggage inside your

7    bedroom?

8    MS. CAMACHO:  No (indiscernible)

9    SPECIAL AGENT PERRY:  You have one bag over here?

10   Okay, all right.  And let me explain to you

11   (indiscernible) security and sometimes we have a

12   problem with people taking contraband on the train,

13   weapons, illegal narcotics, anything illegal.  So we

14   (indiscernible)

15   MS. CAMACHO:  Oh, that's fine.

16   SPECIAL AGENT PERRY:  You guys don't have anything

17   illegal, no weapons or anything illegal with you

18   today?

19   MS. CAMACHO:  No (indiscernible)

20   SPECIAL AGENT PERRY:  (Indiscernible) does this

21   belong to?  Is this your bag, ma'am?

22   MS. CAMACHO:  (Indiscernible)

23   UNIDENTIFIED MALE 1:  (Indiscernible)

24   SPECIAL AGENT PERRY:  Is this your (indiscernible)

25   MS. CAMACHO:  (Indiscernible)

Perry - Direct / By Mr. Crews                    38

 1          SPECIAL AGENT PERRY:  Yours?

 2          MS. CAMACHO:  Uh-huh.

 3          SPECIAL AGENT PERRY:  Okay, would you voluntarily

 4          give me permission to search it for contraband,

 5          ma'am?

 6          MS. CAMACHO:  Yeah.

 7          SPECIAL AGENT PERRY:  Okay, do you understand, sir

 8          (indiscernible)

 9          MS. CAMACHO:  Yeah.

10          SPECIAL AGENT PERRY:  Would you give me permission to

11          go inside your room to do that?

12          MS. CAMACHO:  (Indiscernible)

13          SPECIAL AGENT PERRY:  And do you give me permission

14          to go in your room, though?

15          MS. CAMACHO:  Yeah (indiscernible)

16          SPECIAL AGENT PERRY:  Okay, thank you, sir.  Do you

17          give me permission to come in and check it inside,

18          sir?

19          UNIDENTIFIED MALE 1:  (Indiscernible)

20          SPECIAL AGENT PERRY:  Okay, my partner is standing

21          down here (indiscernible) thank you.  How you doing,

22          sir?

23          MR. ROMERO-VEGA:  Good, you?

24      **(Stop playing audio recording at 12:10 p.m.)**

25   //

1   BY MR. CREWS:

2   Q    Who's voice was that we just heard?

3   A    Well, it was at the time I believed Mr. Carrillo, but it

4   was Mr. Romero-Vega.  He walked up, was standing out in the

5   hallway, and entered the bedroom across the hallway from where

6   I was standing.

7        (Begin playing audio recording at 12:10 p.m.)

8             SPECIAL AGENT PERRY:  How are you, sir?  Are you

9             traveling with them?

10            MR. ROMERO-VEGA:  No, we're over here.

11            SPECIAL AGENT PERRY:  Okay, all right.  Do you speak

12            English?

13            MR. ROMERO-VEGA:  Yeah.

14            SPECIAL AGENT PERRY:  Okay, all right.

15            (Indiscernible) security so we just check the train

16            for security.

17            MR. ROMERO-VEGA:  Oh.

18            SPECIAL AGENT PERRY:  You've got a lot of clothes in

19            there.  (Indiscernible) sir.

20            MS. CAMACHO:  (Indiscernible)

21            SPECIAL AGENT PERRY:  Okay, and do you give

22            permission to search this bag here?

23            UNIDENTIFIED MALE 1:  (Indiscernible)

24            SPECIAL AGENT PERRY:  You give me permission to

25            search it, take the stuff out.  Thank you.

1          (Indiscernible) whatever you want to do.

2          (Indiscernible) give permission (speaks Spanish)

3          UNIDENTIFIED MALE 1:  No.

4          SPECIAL AGENT PERRY:  (Speaks Spanish)

5          UNIDENTIFIED MALE 1:  (Speaks Spanish)

6          SPECIAL AGENT PERRY:  Okay.  Hey, ma'am, there's a

7          purse in here.  Is this your purse?

8          MS. CAMACHO:  Yeah.

9          SPECIAL AGENT PERRY:  Will you give me permission to

10         search that for contraband?

11         MS. CAMACHO:  Yes (indiscernible)

12         SPECIAL AGENT PERRY:  You have -- you said you have

13         two bags downstairs?

14         MS. CAMACHO:  No, that one and (indiscernible)

15         there's the second one.

16         SPECIAL AGENT PERRY:  Okay, I thought you said two

17         bags downstairs.

18         MS. CAMACHO:  Yeah, that's where I said

19         (indiscernible)

20         SPECIAL AGENT PERRY:  So you don't have any bags

21         downstairs?

22         MS. CAMACHO:  No.

23         UNIDENTIFIED MALE 1:  No, no, no.

24         SPECIAL AGENT PERRY:  Okay, that's fine.

25         UNIDENTIFIED MALE 1:  No.

1          SPECIAL AGENT PERRY:  All right.  Can you step over

2          here, sir?  Can you (indiscernible) for me?

3          MS. CAMACHO:  (Indiscernible)

4      **(Stop playing audio recording at 12:14 p.m.)**

5          **MR. CREWS:**  Now I'm going to put in the second disk.

6      **(Begin playing audio recording at 12:15 p.m.)**

7          SPECIAL AGENT PERRY:  How are you doing, sir?  I'm a

8          police officer.  Hello, ma'am, I'm a police officer.

9          May I speak to you (indiscernible)

10         MR. ROMERO-VEGA:  Yes.

11         SPECIAL AGENT PERRY:  Do you speak English okay, sir?

12         How about you, ma'am, do you speak English?

13     **(Stop playing audio recording at 12:15 p.m.)**

14   **BY MR. CREWS:**

15   Q    Let me interrupt you -- our playing of this for just a

16   moment.  Who are you speaking with there?

17   A    That's Mr. Romero-Vega and Ms. Torres.

18     **(Start playing audio recording at 12:15 p.m.)**

19         SPECIAL AGENT PERRY:  (Speaks Spanish) I'm a police

20         officer, sir.  May I speak with you just for a

21         moment?  (Speaks Spanish) Where are you traveling

22         today, sir?

23         MR. ROMERO-VEGA:  Los Angeles to Chicago.

24         SPECIAL AGENT PERRY:  Chicago?

25         MR. ROMERO-VEGA:  Yes.

 1          SPECIAL AGENT PERRY:  Is that your final destination?

 2          MR. ROMERO-VEGA:  Well, actually, I was about to get

 3          all that and then (indiscernible)

 4          SPECIAL AGENT PERRY:  Do you have your tickets with

 5          you?

 6          MR. ROMERO-VEGA:  Uh-huh.

 7          SPECIAL AGENT PERRY:  May I see them, please?

 8          MR. ROMERO-VEGA:  (Indiscernible)

 9          SPECIAL AGENT PERRY:  (Indiscernible) same room

10          you're traveling together?

11          MR. ROMERO-VEGA:  Say what?

12          SPECIAL AGENT PERRY:  You're in the same room.  Are

13          you all traveling together?

14          MR. ROMERO-VEGA:  Oh, yeah, we're traveling together.

15          (Indiscernible)

16          SPECIAL AGENT PERRY:  (Indiscernible) stay in

17          Chicago?

18          MR. ROMERO-VEGA:  Well, like (indiscernible)

19          SPECIAL AGENT PERRY:  Miguel Rodriguez and --

20          MR. ROMERO-VEGA:  No, this is me.

21          SPECIAL AGENT PERRY:  Stephany Torres, is that you?

22          MS. TORRES:  Yes.

23          SPECIAL AGENT PERRY:  And Kevin Carrillo.  Okay, do

24          you have ID with you, sir?  Here's your tickets back.

25          MR. ROMERO-VEGA:  Identification (indiscernible)

1      SPECIAL AGENT PERRY:  Are you all

2      boyfriend/girlfriend or husband and wife?

3      MR. ROMERO-VEGA:  (Indiscernible) getting married.

4      SPECIAL AGENT PERRY:  You are getting married?

5      MR. ROMERO-VEGA:  (Indiscernible)

6      SPECIAL AGENT PERRY:  Where do you folks actually

7      live?

8      MR. ROMERO-VEGA:  Actually we're moving right now.

9      SPECIAL AGENT PERRY:  To where?

10     MR. ROMERO-VEGA:  To California.

11     SPECIAL AGENT PERRY:  Okay, so where do you actually

12     live at right now, though?

13     MR. ROMERO-VEGA:  (Indiscernible)

14     SPECIAL AGENT PERRY:  Stephany Joanna Torres?

15     MS. TORRES:  (Indiscernible)

16     SPECIAL AGENT PERRY:  Okay, 11/29/87, thank you.

17     Thank you, sir, there's your ID.  May I take yours

18     out of here?  Thank you.  And Kevin Patrick Carrillo?

19     MR. ROMERO-VEGA:  Yes, sir.

20     SPECIAL AGENT PERRY:  Did you used to live in Los

21     Angeles?

22     MR. ROMERO-VEGA:  Yeah, I used to live in

23     (indiscernible)

24     SPECIAL AGENT PERRY:  7/5/94, okay, thank you.  So

25     you --

1          **THE COURT:**  Can you please stop?

2          SPECIAL AGENT PERRY:  -- where do you actually live

3     at right now?

4          MR. ROMERO-VEGA:  (Indiscernible)

5          **THE COURT:**  Excuse me, can you please stop the disk?

6     **(Stop playing audio recording at 12:17 p.m.)**

7          **THE COURT:**  The interpreter needs to switch --

8          **MR. SPEAKER:**  I believe they already did, your Honor.

9          **THE COURT:**  You switched it?  Okay.  We have a new

10    interpreter here so we need to swear the new interpreter.

11    **(Unidentified interpreter sworn)**

12         **THE COURT:**  All right, was there any period of lapse

13    between when you were interpreting -- when the last interpreter

14    was interpreting and when you came on?

15         **MR. SPEAKER:**  There was not, your Honor.

16         **THE COURT:**  Okay, all right.  If you could just maybe

17    back up the disk a minute.

18         **MR. CREWS:**  Certainly, your Honor, no problem.  We

19    ready to proceed, your Honor?

20         **THE COURT:**  You may.  The witness is asking for

21    water.

22         **THE WITNESS:**  I'm okay, that's okay, I'll be all

23    right.

24         **THE COURT:**  Is there -- can you bring the witness

25    some water?  I think there are cups there.

1        **MR. MYSLIWIEC:**  There are cups, your Honor, but

2   there's no water.

3            **THE CLERK:**  I can get it real quick.

4            **THE COURT:**  Okay, we'll just take a minute.

5        **(Pause awaiting water)**

6            **THE COURT:**  All right, you may proceed.

7            **MR. CREWS:**  Thank you, your Honor.

8        **(Begin playing audio recording at 12:20 p.m.)**

9            SPECIAL AGENT PERRY:  You are getting married?

10           MR. ROMERO-VEGA:  We are (indiscernible)

11           SPECIAL AGENT PERRY:  Where do you folks actually

12           live?

13           MR. ROMERO-VEGA:  Actually we are moving right now.

14           SPECIAL AGENT PERRY:  To where?

15           MR. ROMERO-VEGA:  To California.

16           SPECIAL AGENT PERRY:  Okay, so where do you actually

17           live at right now, though?

18           MR. ROMERO-VEGA:  (Indiscernible)

19           SPECIAL AGENT PERRY:  Stephany Joanna Torres?

20           MS. TORRES:  (Indiscernible)

21           SPECIAL AGENT PERRY:  Okay, 11/29/87, thank you.

22           Thank you, sir, there's your ID.  May I take yours

23           out of here?  Thank you.  And Kevin Patrick Carrillo?

24           MR. ROMERO-VEGA:  Yes, sir.

25           SPECIAL AGENT PERRY:  Did you used to live in Los

1        Angeles?

2        MR. ROMERO-VEGA:  Yeah, I used to live in

3        (indiscernible)

4        SPECIAL AGENT PERRY:  7/5/94, okay, thank you.  So

5        you -- where do you actually live at right now, sir?

6        MR. ROMERO-VEGA:  (Indiscernible)

7        SPECIAL AGENT PERRY:  You're moving to Orlando?

8        MR. ROMERO-VEGA:  No, no.

9        MS. TORRES:  (Indiscernible)

10        SPECIAL AGENT PERRY:  (Indiscernible)

11        MR. ROMERO-VEGA:  We don't (indiscernible)

12        SPECIAL AGENT PERRY:  Where did you board the train?

13        MR. ROMERO-VEGA:  Where?

14        SPECIAL AGENT PERRY:  Uh-huh.

15        MR. ROMERO-VEGA:  (Indiscernible) in -- well,

16        actually (indiscernible) it's in (indiscernible)

17        SPECIAL AGENT PERRY:  Okay, where did (indiscernible)

18        where do you live?

19        MS. TORRES:  In California.

20        SPECIAL AGENT PERRY:  You live in California?

21        MS. TORRES:  (Indiscernible)

22        SPECIAL AGENT PERRY:  So you're going to Orlando for

23        vacation, for business --

24        MR. ROMERO-VEGA:  No, no (indiscernible) we have to

25        go in the car and then (indiscernible) you know,

Perry - Direct / By Mr. Crews                    47

1              trying to get on the train or turn back.

2              SPECIAL AGENT PERRY:  Okay, so you're going to go

3              pick up a car and go back to California.  Are you

4              folks traveling with anybody else or are you all by

5              yourself?

6              MR. ROMERO-VEGA:  No, we're (indiscernible)

7              SPECIAL AGENT PERRY:  You're not traveling with

8              anybody else?

9              MR. ROMERO-VEGA:  No.

10             SPECIAL AGENT PERRY:  Okay.  We checked this room --

11        **(Stop playing audio recording at 12:21 p.m.)**

12   **BY MR. CREWS:**

13   Q    Just to make clear, what was his statement when you asked

14   if he was traveling with anybody else?

15   A    He said no, they were not, they were by themselves.

16        **(Begin playing audio recording at 12:22 p.m.)**

17             SPECIAL AGENT PERRY:  -- and it's for security

18             reasons, okay?  Do you folks have any luggage on the

19             train with you?

20             MR. ROMERO-VEGA:  Yeah, we do.

21             SPECIAL AGENT PERRY:  Where's your luggage located?

22             MR. ROMERO-VEGA:  (Indiscernible) downstairs.

23             SPECIAL AGENT PERRY:  How many bags do you have

24             downstairs?

25             MR. ROMERO-VEGA:  We have two.

1        SPECIAL AGENT PERRY:  Two bags?

2        MR. ROMERO-VEGA:  (Indiscernible)

3        SPECIAL AGENT PERRY:  So you have two bags

4        downstairs.  Do you have any bags up here?

5        MR. ROMERO-VEGA:  (Indiscernible)

6        SPECIAL AGENT PERRY:  The bags that you have in your

7        room (indiscernible)

8        MS. TORRES:  (Indiscernible)

9        MR. ROMERO-VEGA:  (Indiscernible)

10       SPECIAL AGENT PERRY:  Would you give me permission to

11       search (indiscernible)

12       MR. ROMERO-VEGA:  (Indiscernible) this is not mine.

13       SPECIAL AGENT PERRY:  Would you give me permission to

14       come inside your room to check?  Is that okay with

15       you?  That's my partner in the hall.

16       MR. ROMERO-VEGA:  Do you want me to (indiscernible)

17       SPECIAL AGENT PERRY:  No, that's okay, sir

18       (indiscernible) them searched?  And this is your

19       purse, ma'am?

20       MS. TORRES:  Yes.

21       SPECIAL AGENT PERRY:  Do you give me permission to

22       search that?

23       MS. TORRES:  Uh-huh.

24       SPECIAL AGENT PERRY:  And is this your -- who does

25       this belong to?

1          MR. ROMERO-VEGA:  (Indiscernible)

2          SPECIAL AGENT PERRY:  Would you give me permission to

3          search this also, sir?

4          MR. ROMERO-VEGA:  (No audible response)

5          MS. TORRES:  (Indiscernible)

6          SPECIAL AGENT PERRY:  Can you show me the bags

7          downstairs, please?  Thank you.  Would you give me

8          permission to search your bags (indiscernible)

9          MR. ROMERO-VEGA:  (Indiscernible)

10         SPECIAL AGENT PERRY:  (Indiscernible) anybody else,

11         you're by yourselves?  Did you go out to California

12         with anybody else or by yourselves?

13         MR. ROMERO-VEGA:  No (Indiscernible)

14         SPECIAL AGENT PERRY:  (Indiscernible)

15      **(Stop playing audio recording at 12:26 p.m.)**

16         **MR. CREWS:**  And we have one more, your Honor

17   (indiscernible)

18      **(Begin playing and immediately stop playing audio**

19   **recording at 12:27 p.m.)**

20   **BY MR. CREWS:**

21   Q    Let me stop for a moment.  Is this a continuation of the

22   same conversation?

23   A    Yes.  Actually the second recording that you played was

24   downstairs partially -- went into downstairs in the common

25   luggage area when I was searching the luggage.  And then once

1   Mr. Romero-Vega and Ms. Torres walked back upstairs and went in

2   their bedroom, that's when I hit my recorder again and

3   continued my recorder once I spoke with them at their bedroom.

4   This is back at bedroom number 19.

5   Q    Same voices you previously identified as the Defendant's

6   and his traveling companion?

7   A    Yes, sir.

8          **(Begin playing audio recording at 12:28 p.m.)**

9          SPECIAL AGENT PERRY:  Next to what?

10         MR. ROMERO-VEGA:  To make -- because they

11         (indiscernible)

12         SPECIAL AGENT PERRY:  Who's "they?"

13         MR. ROMERO-VEGA:  (Indiscernible)

14         SPECIAL AGENT PERRY:  These two people here?

15         MR. ROMERO-VEGA:  Yeah, the lady (indiscernible)

16         SPECIAL AGENT PERRY:  So she can come over here?

17         MR. ROMERO-VEGA:  (Indiscernible)

18         SPECIAL AGENT PERRY:  But you don't know her?

19         MR. ROMERO-VEGA:  No, I don't know.

20         SPECIAL AGENT PERRY:  There's one over there?

21         MR. ROMERO-VEGA:  (Indiscernible)

22         SPECIAL AGENT PERRY:  Can you step down here?

23         MR. ROMERO-VEGA:  (Indiscernible)

24         **(Multiple indiscernible voices speaking at the same**

25         **time at 12:29:03)**

1          SPECIAL AGENT PERRY:  Give me your hand.  Sir, relax.

2          Sir, relax, you're under arrest.  I'll explain it to

3          you when we get off the train.

4          UNIDENTIFIED MALE 1:  (Speaks Spanish)

5          MR. ROMERO-VEGA:  Listen, listen.

6          SPECIAL AGENT PERRY:  (Indiscernible)

7          MR. ROMERO-VEGA:  Listen, please.

8          **(Multiple indiscernible voices speaking at the same**

9          **time at 12:29:44)**

10         SPECIAL AGENT PERRY:  Sit down on your butt.  Sit

11         down now.  Sit down, all the way to the bottom.

12         Stand up and let's walk off the train.

13         (Indiscernible) we'll loosen them up outside.

14         MS. CAMACHO:  Where am I going?

15         (Multiple indiscernible voices speaking at the same

16         time at 12:31:04)

17      **(End playing audio recording at 12:31 p.m.)**

18         **MR. CREWS:**  Your Honor, we'd move for admission of

19   the disks, 1, 2, and 3, as exhibits for the Court's record.

20         **MS. JOHNSON:**  No objection, your Honor.

21         **THE COURT:**  All right, they'll be admitted as

22   Exhibits 1, 2, and 3.  Have you marked them?

23      **(Government's Exhibits Numbers 1, 2, and 3 were received**

24   **in evidence)**

25   //

1    **BY MR. CREWS:**

2    Q    Now, Agent Perry, you believed that you had probable cause

3    to arrest the Defendant for what?

4         **MS. JOHNSON:**  Objection, calls for a legal

5    conclusion.

6         **THE COURT:**  Well, I'm going to overrule the

7    objection.  He's asking what his -- what he believed the reason

8    for -- his belief for what he arrested him.

9         **MS. JOHNSON:**  Your Honor, under the case law, his

10   belief is irrelevant.  The Court has to make an analysis based

11   on the objective, what an objective, reasonable officer under

12   the circumstances he would have had probable cause to arrest

13   for, not his subjective belief.  So I would argue that it's

14   also irrelevant and it's calling for a legal conclusion.

15        **THE COURT:**  All right, the objection is overruled.

16        **MR. CREWS:**  That is true from the objective view -- I

17   agree with her analysis of the case law, your Honor.  With

18   respect to the objective analysis of whether or not probable

19   cause existed, that's different than what he believed he had

20   probable cause for and a rationale of what he went forward to

21   do.

22        **THE COURT:**  Right.  The Court has overruled the

23   objection.  The Court is not going to consider his belief on

24   the ultimate question of whether there is probable cause.  You

25   asked him what he believed and he can answer the question.

Perry - Direct / By Mr. Crews                                53

1   **BY MR. CREWS:**

2   A    Would you mind asking the question again, please?

3   Q    All right.  What did you believe you had probable cause to

4   arrest him for?  The Defendant.

5   A    For conspiracy to possess with intent to distribute

6   methamphetamine.

7   Q    And I'll leave it with that.  Did the Defendant tell you

8   that he was traveling with anyone?  How many times did he tell

9   you he was -- well, did he ever make any statements with

10  respect to whether or not he was traveling with anyone?

11  A    Yes, he did.

12  Q    And what were those statements?

13  A    On one occasion he stated that he was traveling with his -

14  - he didn't refer to her as his fiancé -- the person that was

15  in the room with him, Ms. Torres.  But to my recollection from

16  listening to the recordings, on numerous occasions -- on four

17  different occasions he actually said he wasn't -- they weren't

18  traveling with anyone else.

19  Q    All right.  You had testified earlier that he had a

20  document with him with respect -- that was attached to the

21  tickets.

22  A    Yes, sir.

23  Q    And what was that again?

24  A    I refer to it as a train reservation receipt.  It's a

25  white piece of paper that's stapled to your train ticket.

Perry - Cross / By Ms. Johnson                         54

1    That's what I was referring to.

2    Q    All right, and what names are on that?

3    A    There were four names on that:  Miguel Rodriguez, Tyra

4    Camacho, Stephany Torres, and Kevin Carrillo.

5              **MR. CREWS:**  I'll pass the witness, your Honor.

6              **MR. CREWS:**  Good afternoon, Agent Perry.

7              **THE WITNESS:**  Good afternoon.

8                        **CROSS EXAMINATION**

9    **BY MS. JOHNSON:**

10   Q    Agent Perry, you checked the itineraries (indiscernible).

11   A    Yes, ma'am, I did.

12   Q    And that's when you learned of these two reservations that

13   were flagged for you or that you flagged.

14   A    That's the two reservations that I testified to today,

15   yes.

16   Q    And when you checked the itinerary, you knew -- or you

17   learned of the passengers' names, right?

18   A    The names that were on the reservations, yes.

19   Q    So when you went -- and then you went down to the train

20   station, right?

21   A    Yes, ma'am.

22   Q    And when you went down to the train station, you didn't

23   know anything about Kevin Carrillo.

24   A    No, I did not.

25   Q    You didn't know anything about Stephany Torres?

Perry - Cross / By Ms. Johnson                          55

1   A    No, that's not correct.

2   Q    Prior to going to the train station you testified you knew

3   something about Ms. Torres?

4   A    I didn't testify to that, you just asked me that question.

5   But yes, I did.  That name, Stephany Torres, I did know

6   something about that name.

7   Q    And what did you know?

8   A    That that name, Stephany Torres, which was spelled with a

9   "Y" instead of an "I-E," was believed to be someone that was

10  transporting methamphetamine from California to Orlando,

11  Florida.

12  Q    Now, you wrote a report in this case, right?

13  A    Yes, ma'am, I did.

14  Q    But you didn't document that in that report, did you?

15  A    I don't believe it's in the report.

16  Q    And, in fact, the reservation doesn't give you the date of

17  birth of the individuals, right?

18  A    No, the reservation does not.

19  Q    But yet you managed to conclude that of all of the

20  Stephany Torreses in the United States, this particular

21  Stephany Torres was suspected of doing this.

22  A    Well, when you say this specific Stephany Torres, the name

23  Stephany was with a "Y."  From my experience, that is not a

24  common spelling of Stephanie.  And I concluded from my

25  experience that the passengers I was looking for were traveling

1   from California to Orlando, and this person, under the name of

2   Stephany Torres, was from Orlando, Florida and was shipping

3   packages of methamphetamine from California to Orlando.  I

4   didn't think that was a coincidence.  I believed that my --

5   from my experience, it -- I didn't know for sure, but I

6   believed it was probably the same Stephany Torres.

7   Q    But you don't know that.

8   A    I didn't know for 100 percent accuracy, no, but I believed

9   that.

10  Q    And you note this as an important fact, but yet it's not

11  in your police report.

12  A    I think it was important but I don't believe it's in my

13  report.

14  Q    And we'll get to your police reports in just a second.

15  Agent Perry, sir, you went to the train station, you know

16  nothing about Mr. Carrillo or the other passengers, Mr.

17  Rodriguez and Ms. Camacho.

18  A    Other than the PNR, I didn't know any information about

19  them, no.

20  Q    So when did you check the PNR, sir?

21  A    Prior to going to the Amtrak train, some time that

22  morning.

23  Q    And when did you go to the Amtrak train station?

24  A    I don't know the exact time.

25  Q    So you get to the train station and you said that you had

1  Mr. Small speak with the attendant to car 431.

2  A    Yes, I asked him if he would do that.

3  Q    And he relayed to you some information that you testified

4  about on direct examination, right?

5  A    Yes, ma'am, he did.

6  Q    And that was the information that the car attendant

7  allegedly told Mr. Small.

8  A    He passed information to me that he said the car attendant

9  told him, yes.

10 Q    And you heard Mr. Small testify that the car attendant

11 emphasized what -- that the passengers in 431 had been moved to

12 440, right?

13 A    That's correct.

14 Q    And that she allegedly said this three different times?

15 A    He didn't tell me that.  He just said that the car

16 attendant said that they -- basically from what I recall is

17 that the car attendant told him that the passengers moved --

18 requested to be moved to 440, across from the passengers that -

19 - because they were traveling together.

20 Q    And you don't know who that car attendant is?

21 A    I don't know the name.  I know the face, I just -- I don't

22 know the name.

23 Q    Now, you've made mistakes in police reports in the past

24 documenting what witnesses have allegedly told you, right?

25 A    I'm not perfect.  I'm sure I've made mistakes on probably

Perry - Cross / By Ms. Johnson                              58

1   many a police reports.

2   Q    And, in fact, you're very familiar with Gerardo de la

3   Campa Rangel?

4   A    Yes, ma'am, I am.

5   Q    And you arrested Mr. Rangel in 2005, right?

6            **MR. CREWS:**  Your Honor, an arrest in 2005, I'm not

7   seeing any connection to probable cause (indiscernible) arrest.

8            **MS. JOHNSON:**  Your Honor, this goes to credibility.

9   This is a published opinion and it goes to the issue of

10  credibility because there is a reference here that some witness

11  allegedly told the agents or Mr. Small some information that is

12  documented.  I think that it's important for the Court to know

13  that there have been errors made in the past regarding

14  documenting what eyewitnesses have told this agent.

15           **MR. CREWS:**  Your Honor, there is no published opinion

16  regarding a credibility finding of this witness.

17           **MS. JOHNSON:**  Well, your Honor, the Court can review

18  it and then you can make the decision.  It's 519 F.3rd 1258.

19  And I can make a proffer, your Honor, and then you can decide

20  whether I can be allowed to go into it.  Essentially, based on

21  that opinion on May 2nd, 2005, Agent Perry filed a criminal

22  complaint against Mr. Campa Rangel where he stated that a

23  witness on the bus had observed Mr. Campa Rangel remove a small

24  black bag and place it underneath the bus.  Then he testified

25  on May 3rd, 2005, regarding that same account; and during a

1  preliminary hearing, he was asked whether someone had relayed

2  information to him about observing Mr. Rangel remove a bag.

3  And the agent testified that he had received information from a

4  witness who was on the bus that informed him that the witness

5  had seen Mr. Rangel remove the bag.  Then Agent Perry disclosed

6  his DEA report.  In the report, he did not say that he had

7  received information from the eyewitness who had seen Mr.

8  Rangel remove the bag from the bus and place it underneath, but

9  rather that someone had relayed information from the bus driver

10 hours before it had arrive in Albuquerque.  Then Mr. Rangel

11 proceeded to trial.  And then the bus driver testified.  He

12 testified that he did not relay that information to the bus

13 station manager.  It turns out that the tip that Agent Perry

14 had received was from the bus station manager.  However, the

15 driver had testified that he had never relayed that information

16 to the bus station manager and that he had never observed Mr.

17 Rangel remove the bag from the bus and place it underneath.

18 But Agent Perry testified that the bus station manager had

19 relayed information to him that the bus driver had told the

20 manager that he had observed Mr. Rangel remove the bag.  So it

21 goes to the issue, your Honor, of credibility.  You can do with

22 it what you like.  I think that this is an important issue in

23 the sense that we have Mr. Small, who claims to have received

24 information from the attendant but yet doesn't recall who the

25 attendant is, and that allegedly the attendant said three times

Perry - Cross / By Ms. Johnson                    60

1   that these two couples were traveling together, but yet that's

2   not documented in the report.  And that's essentially it, your

3   Honor.

4              MR. MYSLIWIEC:  Your Honor, very briefly I want to

5   clarify something for you.  Ms. Johnson has correctly reported

6   that at trial, the bus driver said that he did not pass on the

7   tip.  Agent Perry's testimony was that he had received a tip

8   that originated from the bus driver.  The Tenth Circuit

9   expressed some concern, as you might expect, that two of the

10  Government's witnesses would express a different or conflicting

11  story at trial.  But there -- as Mr. Crews correctly said, no

12  judge has made an adverse credibility finding against Special

13  Agent Perry.  After the Tenth Circuit expressed that concern

14  and remanded the matter to the district court for the district

15  court here in the District of New Mexico to explore the concern

16  and make findings, Mr. de la Campa Rangel elected to, instead

17  of seeing that through to its conclusion, plead guilty and be

18  deported, which he was.  So we can't speculate as to what any

19  district court might have found.  Really, we're not allowed to

20  speculate as to what a district court may have found.  But what

21  we do know is that no district court has ever found that

22  Special Agent Perry was ever dishonest with the Court or that

23  (indiscernible) have ever had any adverse credibility finding

24  against him.  So now that you've heard that, you could allow

25  this to be explored at any length you want.  There's no jury

Perry - Cross / By Ms. Johnson                          61

 1  here so there's no risk for confusion.  But just be clear that

 2  at the end of the day, no district court has made any adverse

 3  credibility finding against Special Agent Perry, and neither

 4  has any appellate court.

 5          **THE COURT:**  All right.  I may allow you to get into

 6  this line of questioning.  But the reason that you've

 7  proffered, which is that Agent Small may have lacked

 8  credibility, seems irrelevant to whether Agent Perry lacks

 9  credibility.  So I'll let you proceed, and if a credibility

10  issue comes up for which you want to cross examine him about

11  prior credibility issues, at that point we can take this up

12  again.  But the proffered reason, which seems to have to do

13  with Agent Small's -- or Mr. Small's credibility does not

14  create enough of a connection here for you to get into that

15  line of questioning in the Court's mind.

16          **MS. JOHNSON:**  I'll move on, your Honor.  And if that

17  issue comes up, I'll explore it again.

18  **BY MS. JOHNSON:**

19  Q    Now, Agent Perry, you do know that the Amtrak train has a

20  route from Fullerton, California to Orlando, Florida.

21  A    Yes, ma'am.

22  Q    Nothing unusual about traveling from Fullerton to Orlando.

23  A    No, ma'am.

24  Q    Now, when you approached Mr. Rodriguez and Ms. Camacho

25  outside of the train, what you knew is you had two reservations

Perry - Cross / By Ms. Johnson                    62

1   of two different couples that, in your opinion, may be

2   traveling together, right?

3   A    In my opinion I don't think they may have been traveling

4   together.  In my opinion, they were traveling together, from my

5   experience.

6   Q    But you didn't know these folks.

7   A    I didn't know them, no.

8   Q    And so you approached Mr. Rodriguez and Ms. Camacho and

9   you had an encounter with them, as we heard, right?

10  A    Yes, ma'am.

11  Q    And they gave you permission to search their room and

12  their luggage.

13  A    Yes, ma'am, they did.

14  Q    And Ms. Camacho -- you asked Ms. Camacho if she was

15  traveling with anyone and she said a friend, right?

16  A    Yes.

17  Q    And she never said who the friend was.

18  A    No, she did not.

19  Q    And then she later said a male and female, right?

20  A    That's correct.

21  Q    And she never said who the friend was.

22  A    She didn't give a name, no.

23  Q    Now, at this point you have no idea if Ms. Camacho and Mr.

24  Rodriguez are telling you -- or Ms. Camacho is telling you the

25  truth, right?

1   A    About traveling with --

2   Q    About traveling with someone else.

3   A    (No audible response)

4   Q    You don't know.

5   A    I can tell you what I believe, but I don't know for sure

6   if she's telling me the truth.  But from the other --

7   Q    All right, thank you, Agent Perry.

8   A    I wasn't finished answering.

9   Q    Well, I --

10  A    From my --

11  Q    -- am done with my question, sir.

12          THE WITNESS:  Can I be allowed to answer the

13  question, your Honor.

14          THE COURT:  If there's additional information that

15  you have to answer the question, you can answer it.

16          THE WITNESS:  Yes.  I believe Ms. Camacho, from what

17  the car attendant had told Agent Small from the reservation, I

18  believe that she was telling me the truth about traveling with

19  the other couple.

20  BY MS. JOHNSON:

21  Q    Again, she never identified the other couple.

22  A    No, she did not.

23  Q    So you searched Mr. Rodriguez's bag and there you found

24  what you believed was methamphetamine, right?

25  A    Did you -- I'm sorry, whose bag did you say?

Perry - Cross / By Ms. Johnson                                64

1  Q    Mr. Rodriguez's bag.

2  A    Yes.

3  Q    And then in Mr. Rodriguez's room, you didn't find any

4  information linking Mr. Rodriguez's room to Mr. Romero-Vega,

5  right?

6  A    No, ma'am.

7  Q    You then -- after you arrested Mr. Rodriguez and Ms.

8  Camacho, you went to room 20.

9  A    No, they were in room 20; I went to room 19.

10  Q    Excuse me, you went to room 19.  And that's where you

11  encountered Mr. Romero-Vega and Ms. Torres?

12  A    Yes, ma'am.

13  Q    And they were cooperative with you.

14  A    Yes.

15  Q    But you also know that Mr. Romero-Vega doesn't speak

16  English very well, right?

17  A    I asked him if he spoke English.  And from the recordings

18  that you heard, I believe that he spoke English well enough for

19  me to speak with him in English.

20  Q    But you understand he speaks English with a very heavy

21  accent, and you don't know how well he understands English,

22  right?

23  A    From the questions that I asked him, I believe that he

24  understood English fine.

25  Q    But you don't know how well he understands English.

1  A    All I know is from what he told me and from the questions

2  that I asked him.

3  Q    Now, you asked Mr. Romero-Vega if he was traveling with

4  Mr. Torres, right?  If he was traveling together with Ms.

5  Torres.

6  A    Yes, ma'am.

7  Q    And he said they were.

8  A    Yes, ma'am.

9  Q    Then you later asked him if he was traveling with anybody

10 else, right?

11 A    Yes, ma'am.

12 Q    And he said they weren't.

13 A    Correct.

14 Q    And -- but you have no idea what Mr. Romero-Vega

15 understood when you asked the second time if he was traveling

16 with someone else.

17         MR. CREWS:  Objection, your Honor -- this witness

18 place himself in the mind of what somebody else understood.

19         MS. JOHNSON:  Exactly.

20         MR. CREWS:  He can't answer that question.

21         MS. JOHNSON:  He can't.  That's exactly right.  He

22 doesn't know, your Honor, and that's what I'm asking.  He

23 doesn't know what Mr. Romero-Vega understood.

24         THE COURT:  You can answer the question.

25 A    All I know is what I asked him and what he stated.  I

1  don't know what was in his mind.

2  **BY MS. JOHNSON:**

3  Q    But when you asked him if he was traveling together with

4  Ms. Torres, who was in the same room as he was, right, he said

5  he was traveling with her.

6  A    Yes, that's correct.

7  Q    But when you asked him are you traveling with anyone else,

8  he said no.

9  A    Yes, on four different occasions.

10 Q    So you don't know if he understood if there was someone

11 else traveling with him in that room, right?

12         **MR. CREWS:**  Same basis for the objection, your Honor.

13 She's asking him to speculate what somebody else believed

14 (indiscernible)

15         **MS. JOHNSON:**  No, the question is, he doesn't know.

16 That's exactly right.  Because to say that Mr. Romero-Vega --

17 because that's one of the arguments, your Honor, that Mr.

18 Romero-Vega --

19         **THE COURT:**  He can answer the question.

20 **BY MS. JOHNSON:**

21 Q    You don't know if he understood you to say are you

22 traveling with someone else in the room.  You don't know what

23 he understood, do you?

24 A    I don't -- again, I don't know what was in his mind.  All

25 I know is what I asked him and what he told me.

Perry - Cross / By Ms. Johnson                          67

1    Q    Now, when you searched Mr. Romero-Vega's room and his

2    luggage, you found nothing illegal.

3    A    That's correct.

4    Q    And at this point, you just had a hunch that he was

5    involved somehow in the drugs -- or with the drugs that you

6    found with Mr. Rodriguez.

7             MR. CREWS:  Objection to the word "hunch," your

8    Honor.  (Indiscernible) ask for him to make a legal conclusion.

9             THE COURT:  If you know what the word "hunch" means,

10   which I don't think is asking for a legal conclusion, you can

11   answer the question.

12   A    Actually, I looked up the definition of the word "hunch"

13   this morning and I believe it's an impression -- I can't

14   remember the exact wording -- but it's an impression that

15   someone may believe.  So to answer your question, I don't

16   believe that I had a hunch.  I believe that I had probable

17   cause; not a hunch.

18   BY MS. JOHNSON:

19   Q    And your probable cause, according to you, was based on

20   these two reservations being purchased close in time, right?

21   A    My probable cause was based upon the totality of the

22   circumstances from the time that I read those reservations

23   until -- and everything that happened at the train station

24   until I placed handcuffs on Mr. Romero-Vega.

25   Q    Let's distill those, your totality of the circumstances.

1   You had two reservations that were purchased near in time to

2   each other, right?

3   A    Not near in time.  They were purchased at exactly the same

4   time.

5   Q    About a minute or two apart.

6   A    It was a minute when they reserved them.  If you look at

7   the PNR, they actually purchased them from the same ticket

8   agent, which is at the same window, at exactly the same time.

9   Q    Then you had some information from a train attendant that

10  the -- that the couples were moved.

11  A    I did have that information, correct.

12  Q    And then that's all you had, wasn't it?

13  A    No, ma'am, that's not correct.

14  Q    What else did you have?

15  A    If you'd like me to go through the totality of the

16  circumstances, I can do that and --

17  Q    Let's talk about them.

18  A    Okay.

19  Q    We've talked about the reservations and we've talked about

20  the train attendant.  Let's talk about your next one.

21  A    The fact that Ms. Camacho told me that they were -- she

22  was traveling with a male and a female --

23  Q    Okay, hold on before you go on to the next one.  She never

24  said who this male and female were.

25  A    No, she did not identify them specifically, no.

1   Q    Okay, go on to the next one.

2   A    The fact that Mr. Romero-Vega told me on four different

3   occasions that he was not traveling with anyone else.

4   Q    But we've talked about that one because you don't know

5   what he understood when you asked him about traveling with

6   anyone else, right?

7   A    No, ma'am.

8   Q    Okay, let's go to the next one.

9   A    That statement you just made is not correct.

10  Q    You don't know -- no, my question to you, sir, was you

11  don't know what Mr. Romero-Vega understood.  Are you telling us

12  now you do know?

13  A    I don't know what he understood.  I can tell you from

14  listening to the recording and from my memory the very first

15  time I asked him if he was traveling with the people -- I was

16  inside of Rodriguez-Mesa's and Ms. Camacho's room.  He walked

17  up and was standing outside of the room.  I asked him, "Are you

18  traveling with them?"  Specifically the people that was across

19  from him, and he said no, they were by themselves.

20  Q    But you don't know if he understood you to ask if he was

21  traveling with them in that room, in room 20.

22  A    I don't know specifically if he understood that I was

23  asking specifically in the room with him.

24  Q    Right.

25  A    That's not what I stated.  I asked him if they were

1   traveling with them.

2   Q    But you know he's not a native English speaker.

3   A    I didn't know anything about Mr. Carrillo or Mr. Romero-

4   Vega.  I don't know.

5   Q    Well, you know that now, right?

6   A    I can make assumptions.  I don't know.

7   Q    All right, well, let's not make assumptions.  Let's go on

8   to the next one.

9   A    What's your next question?

10  Q    You said you had a totality of the circumstances.

11  A    Okay, we went from the PNR, the way they purchased their

12  tickets, the car attendant stating they were traveling

13  together, had them being moved to rooms directly across from

14  one another, the fact that Mr. Romero on four different

15  occasions said he wasn't traveling with them, and the fact that

16  Ms. Camacho said they all were traveling together.  And that's

17  basically the totality of the circumstances I had to believe

18  that Mr. Romero-Vega was involved in the conspiracy with Mr.

19  Rodriguez-Mesa and Ms. Camacho.

20  Q    Now, let me correct you, Agent Perry.  You just said that

21  Mr. Romero-Vega said he was not traveling with them.  What he

22  said he -- he wasn't traveling with anyone else, right?

23  A    I'm telling you from my belief from what he stated when I

24  asked the questions as you asked me on numerous occasions about

25  what was in his mind, I'm telling you what was in my mind and

1   the belief that I had when he answered the questions and he

2   stated he was not traveling with anyone else, which included

3   Mr. Rodriguez-Mesa and Ms. Camacho.  That's what I believed.

4   Q    And so those are your totality, right?  Of the

5   circumstances, correct?

6   A    Yes, ma'am.

7   Q    And then you arrested him for conspiracy to possess with

8   the intent to distribute methamphetamine.

9   A    Yes, ma'am.

10  Q    And once at the DEA office, you ran his fingerprints and

11  you learned his identification or his identity was Pedro

12  Romero-Vega, right?

13  A    That was after he was processed.

14          **MS. JOHNSON:**  May I have a moment, your Honor?

15          **THE COURT:**  Yes.

16          **MR. CREWS:**  (Indiscernible) your Honor.

17          **THE COURT:**  Okay, I think she's taking a moment to

18  see if she has any other questions.

19      **(Pause)**

20          **MS. JOHNSON:**  I have no other questions, your Honor.

21  Thank you.

22      **(Pause)**

23          **THE COURT:**  Okay, we're going to take a brief recess.

24          **MR. CREWS:**  I actually do have one question, your

25  Honor.

Perry - Redirect / By Mr. Crews                      72

1            THE COURT:  Okay.  Can we -- we're just going to take

2    a brief recess and then you can ask your question, okay?  All

3    right?

4        (Recess taken from 12:58 p.m. to 1:19 p.m.)

5            THE COURT:  If the witness would sit down.  I

6    understand that the Government has a redirect question.

7            MR. CREWS:  May it please the Court, counsel.

8            THE COURT:  Yes.

9                        REDIRECT EXAMINATION

10   BY MR. CREWS:

11   Q    Special Agent Perry, on cross examination you were asked

12   to go over various facts; do you remember that?

13   A    Yes, sir.

14   Q    All right.  And then were you asked about a document that

15   the Defendant (indiscernible) by counsel for the Defendant?

16   A    No, I was not.

17   Q    What document did the Defendant have in his possession

18   that linked him to Mr. Rodriguez-Mesa?

19   A    He had a train -- as I referred to it as a receipt for

20   four different passengers that had Mr. Rodriguez-Mesa and Ms.

21   Camacho's name on it that was attached to his ticket.  And as

22   you -- if you listen to the recording, you can hear me read off

23   the name -- when he hands me his ticket, you can hear me read

24   off the name Miguel Rodriguez.  And he says, "No," and he

25   points to his name on the ticket as he does that.

1  Q    And those are the four individuals who were -- names were

2  on the tickets that were purchased in California at the same

3  time for almost $4,000 in cash?

4  A    Yes, sir, that's correct.

5          **MR. CREWS:**  That's all I have, your Honor.

6          **THE COURT:**  All right.  There's nothing further from

7  the defense for Agent Perry?

8          **MS. JOHNSON:**  No, your Honor, thank you.

9          **THE COURT:**  All right, you may be excused.

10          **THE WITNESS:**  Thank you.

11      **(Witness is excused)**

12          **THE COURT:**  All right, as the parties know, this

13  matter was referred to me by Chief Judge Armijo to conduct the

14  hearing and submit proposed findings and recommended

15  disposition.  The Court can certainly do so based on the

16  briefings that have been submitted, as well as the evidence

17  that's been presented.  But I wanted to invite the parties to

18  the extent that you wish to submit closing briefing to the

19  Court, if you wish.  It would be a simultaneous briefing

20  schedule.  But I note that there is a trial setting of I think

21  February 9th.  So I wanted to invite the parties to do closing

22  briefs if you wish for me to do so.  If not, I will go ahead

23  and issue the proposed finding and recommended disposition

24  based on the briefing that's been submitted.

25          **MR. CREWS:**  (Indiscernible) your Honor.

1          **THE COURT:**  Does the defense wish to submit any --

2          **MS. JOHNSON:**  Your Honor, if I may just have a few

3    days to -- I think that it's been briefed sufficiently, but if

4    there's anything additional, I'd like a few days just to have

5    the opportunity to submit.  So at this point, I don't know

6    what's been submitted to the Court already.  But perhaps if the

7    Court can just give us a deadline.

8          **THE COURT:**  Okay.  And the reason I asked, you had

9    mentioned that you might want to brief an additional issue that

10   came up during the hearing.  What about the Government?  Does

11   the Government wish to submit closing briefs?

12         **MR. CREWS:**  I think the (indiscernible) determine

13   probable cause from the appropriate Tenth Circuit standards,

14   your Honor.  I don't have a -- I'd be happy to give you

15   argument if the Court wishes.  But in terms of the legal basis,

16   it would be (indiscernible) put in there in terms of the case

17   law.

18         **THE COURT:**  Okay.

19         **MS. JOHNSON:**  Your Honor, if I could just have a

20   deadline.  That issue may be a non-issue.  But at least to --

21   because I just learned recently that Mr. Small may be

22   testifying, and the extent of his involvement in this case, it

23   may or may not affect the Court's legal analysis.  So if I

24   could just have a deadline if -- in case that I do find

25   something that I think is relevant for the Court to be aware

1    of.

2              **THE COURT:**  Okay.  Is that -- and how much time are

3    you -- would you want for that?

4              **MS. JOHNSON:**  I'll defer to the Court, your Honor.

5              **THE COURT:**  Well, I'm -- I've noticed that there is a

6    trial setting.  Are you -- I mean, if there's additional

7    briefing submitted, it could impact the trial setting.

8              **MS. JOHNSON:**  That will likely be continued, your

9    Honor.  I haven't spoken with Mr. Crews about it, but I can't

10   imagine that this -- the Government would have an objection to

11   continuing the trial.

12             **MR. CREWS:**  I'm sorry, I didn't hear, your Honor.

13             **THE COURT:**  Well, in figuring out what deadline to

14   impose, I inquired of the Defendant whether a briefing schedule

15   might impact the trial setting.  And Ms. Johnson said that she

16   anticipates that the trial setting would be continued, Ms.

17   Johnson, but she wasn't sure whether the Government would have

18   an objection.  Or she assumed that the Government would not.

19             **MR. CREWS:**  I don't, your Honor.

20             **MS. JOHNSON:**  It's very likely we're going to move to

21   continue it just to give the Court obviously an opportunity to

22   issue its ruling and then obviously, depending on whether

23   either side may want to take it up to Judge Armijo, it's very

24   likely that we'll need to continue the February 9th trial.

25             **THE COURT:**  Okay.  All right, would a five-day

1    briefing schedule be adequate time?  Five business days or do

2    you want ten days?

3            **MS. JOHNSON:**  Your Honor, I can try to do it in five

4    days.  I have seven motions to dismiss on two civil cases that

5    I'm responding to right now and those are due February 9th.

6    But I will try to get on this particular issue right away.  So

7    if the Court can give me ten days, but I will try to get it to

8    the Court if I do plan to file something.  If I don't plan to

9    file anything, your Honor, I will notify the Court and counsel.

10           **MR. CREWS:**  I don't -- your Honor, my last day here

11   will be Friday so I don't know who's going to assume

12   responsibility for the case.  So a little more time might, you

13   know, provide them -- I can file whatever you want before I

14   leave, but then I'll be gone.

15           **MR. MYSLIWIEC:**  Alternatively, your Honor, it sounds

16   like the only briefing that would be needed before you can

17   perform your analysis would be the possibility of this new

18   issue.  And so if the United States could just have a week to

19   respond should Ms. Johnson file something on that new issue,

20   that would keep Mr. Crews from having to do a simultaneous

21   briefing on something that may actually not need to be briefed,

22   and it would also save the office from having to scramble to

23   replace Mr. Crews, to the extent that we ever could.

24           **THE COURT:**  Okay.  All right then, based on the

25   parties' request for a briefing schedule that would provide ten

1  days for the defense to submit any additional briefing that it

2  wishes, and the Government would request five business days

3  after the --

4          **MR. MYSLIWIEC:**  Yes, please, your Honor.

5          **THE COURT:**  Okay, all right, so the Court will set a

6  briefing schedule -- I don't have a -- let's look at the

7  calendar and tell me what ten days is.  Ms. Johnson, is ten

8  business days sufficient or would you want ten calendar days?

9  Well, is ten calendar days sufficient or do you want ten

10  business days?

11          **MS. JOHNSON:**  Ten calendar days is sufficient, your

12  Honor.

13          **THE COURT:**  February 5th would be ten days, okay.

14  And then does the Government need five business days?

15          **MR. MYSLIWIEC:**  I would phrase it as seven calendar

16  days.

17          **THE COURT:**  Seven calendar days, okay.  And so then

18  that would be February 13th, all right.  Now, the Court will

19  grant the request for this briefing schedule.  However, my

20  understanding is that you have a trial setting.  When is your

21  trial setting?

22          **MS. JOHNSON:**  February 9th, your Honor, but I intend

23  to file a motion to continue that.  Mr. Crews has indicated

24  that he does not object.  I will file a motion to continue that

25  this week.

1          **THE COURT:**  Okay.  All right then, the Court will set

2     the briefing schedule of February 6th for any supplemental

3     closing brief from the defense; and the Government will have

4     until February 13th to file any responsive briefing.  And you

5     indicated at the beginning of the hearing that you didn't have

6     any witnesses, but I just want to make sure there are no

7     additional witnesses from either side.

8          **MS. JOHNSON:**  Not from the defense, your Honor.

9          **MR. MYSLIWIEC:**  Not from the United States, your

10    Honor.

11         **THE COURT:**  All right then, this matter will be in

12    recess, and I will look forward to any additional briefing from

13    the parties.  Thank you.

14         **THE CLERK:**  All rise.

15      **(This proceeding was adjourned at 1:29 p.m.)**

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    _February 5, 2015_


                    TONI HUDSON, TRANSCRIBER